902 A.2d 888

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. DANIEL DELGADO A/K/A DANIEL JAVIER DELGADO (BIRTH NAME), DEFENDANT–APPELLANT.

Argued March 21, 2006—Decided July 31, 2006.

*James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Kenneth P. Ply,* Assistant Prosecutor, argued the cause for respondent (*Paula T. Dow,* Essex County Prosecutor, attorney).

*Michael A. Baldassare* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Baldassare* and *Lawrence S. Lustberg,* on the brief).

*Linda K. Danielson,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Zulima V. Farber,* Attorney General, attorney).

Justice ALBIN delivered the opinion of the Court.

A jury convicted defendant Daniel Delgado of the murder of Daniel Cortez based primarily on eyewitness testimony. At trial, three witnesses testified that defendant shot Cortez. Shortly after the murder, however, two of those witnesses were unable to identify defendant from a photographic array. When the police showed the same array to those two witnesses a little more than seven months later, they positively identified defendant. Defendant contends that the police were required to record or summarize in a report the dialogue between the witnesses and police

during the out-of-court identification procedures. The failure of the police to do so, defendant argues, resulted in the loss of critical evidence that denied him a fair trial.

Some witnesses at trial also identified defendant's mother's minivan as the vehicle used by the shooter. Defendant complains that his due process rights were violated because the police showed witnesses only that minivan or photographs of it during the murder investigation. Defendant suggests that the police should have conducted an out-of-court procedure akin to a car lineup or photographic array of cars.

The Appellate Division upheld defendant's convictions. Because defendant knew of the missed and positive out-of-court identifications before trial and fully explored them in questioning witnesses, we conclude that he received a fair trial despite any alleged deficiencies in the police reports. We also reject, as did the Appellate Division, defendant's invitation to impose an unprecedented obligation on the police to conduct lineups of inanimate objects, such as cars, as a precondition to the admissibility of identification testimony concerning such objects.

We therefore affirm defendant's convictions for murder and related crimes. However, given the importance of ensuring the accuracy and integrity of out-of-court identifications, we will exercise our rulemaking authority to require, as a condition to the admissibility of out-of-court identifications, that the police record, to the extent feasible, the dialogue between witnesses and police during an identification procedure.

I.

A.

On November 25, 1998, at approximately 7:00 a.m., defendant shot Daniel Cortez to death outside of Cortez's home on North Ninth Street in Newark.[1] The motive for the murder appears to have been revenge. Defendant met Sandra Jorge in the summer

---

[1] This statement of facts is based on the testimony presented at defendant's second trial.

of 1997, and the two began an "off and on" relationship. Approximately one year later, Jorge had a brief romantic interlude with Cortez. When defendant saw Cortez talking to his girlfriend in May 1998, he approached her and asked, "why?" According to one witness, defendant and Cortez exchanged angry words, which threatened to escalate into violence. The police, however, arrived and took defendant, Cortez, Jorge, and their friends to the station house, apparently to cool off. When they left the police station, the same witness related that defendant looked at Cortez, laughed, and said, "I'm going to get you."

One week later, Jorge admitted to defendant that she and Cortez had dated and been intimate. After hearing that, defendant told Jorge that he would "get [Cortez] back." The two never spoke about Cortez again. A week before the shooting, Jorge broke up with defendant because "it wasn't working out." Although "a little upset," defendant amicably parted with Jorge, telling her, "if that's what you want."

On the morning of November 25, 1998, from their various viewpoints, Al Bucci, Edmund DiEduardo, eleven-year-old Richie Munoz, and Anthony Melillo witnessed Cortez's shooting. At trial, DiEduardo, Munoz, and Melillo identified defendant as the shooter. However, DiEduardo and Munoz failed to identify defendant when first approached by the police.

*Al Bucci*

When the police interviewed Bucci on the day of the shooting, he gave a description of both the shooter and the minivan in which the shooter fled from the scene. He described a maroon colored minivan, "like a Caravan," possibly missing a hub cap, with a blue and white New Jersey license plate that began "HAI." That same day, based in part on the information provided by Bucci, the police stopped defendant, who was driving his mother's burgundy Plymouth Voyager, license plate number HAI-30G, which had a missing rear hub cap.[2] Defendant was taken to the station house for

---

[2] For the sake of simplicity, at times, we will refer to the Plymouth Voyager as defendant's minivan.

questioning, where he and the minivan were photographed. The police then prepared an array of six photographs, placing defendant's photograph with those of five similar looking Hispanic males.[3]

Approximately two days later, three detectives came to Bucci's house with four photographs of defendant's minivan. Bucci was unable to identify the minivan as the one driven by the shooter. The detectives then drove Bucci down the street where defendant's minivan was parked. According to Bucci, when he saw the minivan he told the detectives that he was "75 percent sure" that it was the one used in the shooting. The detectives did not prepare a report recording those events. Eight months later, a detective showed Bucci the array containing defendant's photograph, but he was unable to make an identification. This time, however, Bucci did identify defendant's minivan from a photograph displayed to him.

### Edmund DiEduardo

On the day of the shooting, a detective and a prosecutor's investigator visited DiEduardo at work at the Bloomfield Cab Company and showed him the photographic array containing defendant's photograph. DiEduardo could not make an identification. When shown two photographs of defendant's minivan, DiEduardo was unable to identify that minivan as involved in the shooting. The police report referring to the attempted identifications stated that DiEduardo "failed to make a positive identification." Seven and one half months afterwards, two detectives showed DiEduardo the same photographic array and this time he picked out defendant as the shooter. DiEduardo claimed that before selecting defendant's photograph (number five), he first focused on photograph number three. Two weeks later, DiEduardo signed and dated a photograph of defendant's minivan. At

---

[3] The police actually put together two photographic arrays, one of frontal facial views and the other of profile views. Only the array of frontal facial photographs was used.

trial, however, he insisted that that minivan was not the vehicle driven by the shooter.

*Richie Munoz*

On the day of the shooting, two investigating officers took Munoz, who was the victim's cousin, to view defendant's minivan. Munoz did not recognize the vehicle as having any involvement in the shooting. Later that evening, at his home, Munoz was shown the array containing defendant's photograph. He picked out two photographs, number three and defendant's photograph, number five, but could not make a positive identification. The police report relating the attempted identification simply stated that Munoz was "unable to make a positive identification." Seven and one half months later, detectives again showed Munoz the same photographic array. This time Munoz identified defendant as the person who shot his cousin. Two weeks later, Munoz was shown a photograph of defendant's minivan. At trial, a Newark police detective testified that Munoz had identified the minivan as the one involved in the shooting. Munoz, however, testified that although the photograph depicted "the same kind of van," he could not be certain it was the one used by defendant.

*Anthony Melillo*

On the day of the shooting, Melillo avoided contact with the police who had responded to the scene because he "didn't want to get involved." About three weeks later, a detective from the Robbery–Homicide Unit interviewed Melillo at the station house regarding the shooting. Melillo's account of the direction in which the minivan left the scene did not comport with other eyewitness accounts. Because Melillo did not appear cooperative, the interview ended. Melillo explained at trial that he had lied in his first interview in reaction to the investigating detective's hostility towards him. Seven months after the aborted interview, Newark police detectives spoke with Melillo again and this time showed him the array containing defendant's photograph. He identified defendant as the shooter. Two weeks later, Melillo identified a

photograph of defendant's minivan as the vehicle used by defendant in the shooting.

*Defendant*

On December 29, 1998, defendant gave a formal statement to a detective in the Robbery–Homicide Unit, accounting for his time immediately before and during the murder. In that statement, which was read into evidence, defendant denied that he shot Cortez or drove his mother's minivan on North Ninth Street on the day of the murder. He explained to the detective that he had slept at his mother's house the night before the shooting. The next morning he left for work at 6:30 a.m., driving his mother's minivan. He first stopped for breakfast at a coffee shop on the corner of Park Avenue and First Street in Newark and, from there, drove to Union where he worked, punching in at 7:30 a.m. Defendant admitted that once while he and his girlfriend were arguing with each other, Cortez exited his car and approached him. That encounter ended two minutes later when the police arrived. After that day, according to defendant, he never saw Cortez again.

## B.

An Essex County grand jury indicted defendant on charges of first-degree purposeful or knowing murder, in violation of *N.J.S.A.* 2C:11–3(a)(1), (2); third-degree unlawful possession of a weapon, in violation of *N.J.S.A.* 2C:39–5(b); and second-degree possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4(a).

At a pretrial *Wade*[4] hearing, the trial court considered the admissibility of the out-of-court photographic identifications made of defendant by DiEduardo and Munoz. During the hearing, defendant learned that when first shown the array, Munoz "pointed to a couple of photographs" before informing the police that he

[4] *United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967).

was unable to make an identification. Defendant also learned that DiEduardo claimed that he had initially focused on photograph number three before ultimately identifying defendant in photograph number five. The court ruled that showing witnesses the same array on two different occasions did not render the identification procedure impermissibly suggestive. The court further determined that the police officers in no way suggested to the witnesses that a suspect was in the array or directed the witnesses towards a particular photograph. The court therefore concluded that the out-of-court identification procedures were non-suggestive and fair, and admitted the identification testimony at trial. The court noted that it was for the jury to make the ultimate credibility determinations concerning the reliability of the out-of-court identifications.

Defendant's first trial ended when the court declared a mistrial because of the prosecution's breach of its discovery obligations. During Bucci's testimony, defendant learned for the first time that, approximately two days after the murder, the police had shown Bucci both defendant's minivan and photographs of it and that Bucci was unable to make an identification. That discovery breach, the court found, significantly prejudiced the defense, requiring a new trial.

At the conclusion of a second trial, a jury convicted defendant on all three counts of the indictment. The court sentenced defendant to a term of forty years with a thirty-year parole disqualifier for murder and to a concurrent five-year term for unlawful possession of a weapon. The possession of a weapon for an unlawful purpose conviction was merged with the murder conviction. Defendant appealed.

## C.

In an unpublished opinion, the Appellate Division affirmed. The panel first rejected defendant's argument that showing Munoz and DiEduardo the same photographic array a second time after both were unable to make a positive identification seven and one

half months earlier violated his Fourteenth Amendment due process rights. The appellate panel concluded that showing "[a]n identical array, including a single non-suggestive photograph of defendant seven months apart, [did] not render the photographic identification procedure impermissibly suggestive." The panel reasoned that displaying to "a witness the same array twice is far less suggestive than preparing a new array of five new faces to go with the suspect," which could send a "clear signal" suggesting that the witness select the suspect's photograph.

The panel also rejected defendant's argument that the police were required by *State v. Earle*, 60 *N.J.* 550, 292 *A.*2d 2 (1972) (per curiam), to record the comments made by Munoz and DiEduardo during the showing of the first array when they failed to select defendant's photograph. The panel maintained that *Earle* did not necessitate that the police do anything more than "make a record of a misidentification which is clearly exculpatory." The panel specifically found that there were no exculpatory misidentifications in this case and that "[t]he police are not under an obligation to record near misses or near hits."

Last, the panel declined defendant's invitation to apply the due process procedural protections that apply to out-of-court identifications of persons to out-of-court identifications of physical evidence. The panel held that the trial court did not err by admitting testimony concerning the identifications of defendant's minivan by witnesses, even though the minivan or a photograph of it was the only vehicle shown to the witnesses. The panel conceded that "the initial identifications [of defendant's minivan] were made under circumstances that were extremely suggestive." Those procedures, however, "resulted in one total non-identification by DiEduardo, one 'looks similar' identification by Munoz and one positive identification of a photograph by Bucci seven months after a seventy-five percent identification of the actual van." The panel also noted that defendant, who raised the issue for the first time on appeal, had taken "full advantage

of the questionable identifications of the van in his closing argument."

We granted defendant's petition for certification. 185 *N.J.* 297, 884 *A.2d* 1267 (2005). We also granted the motions of the Association of Criminal Defense Lawyers of New Jersey and the Attorney General to participate as amici curiae.

## II.

Defendant contends that the State is obliged to disclose to the defense information about not only positive identifications, but also "failed or inconclusive identification attempts." Defendant suggests that the failure to record what occurs at an identification procedure is akin to the destruction of relevant, if not exculpatory, evidence. He maintains that the due process guarantee of the Fourteenth Amendment and this Court's decision in *Earle, supra,* compel the State to provide discovery concerning out-of-court identification procedures, regardless of the result.

The State responds that before the start of defendant's second trial he knew all the details of the out-of-court identification procedures resulting in the failed and positive identifications. Armed with that information, the State submits, defendant was free to cross-examine and impeach the State's witnesses, attack the State's case, and present a full defense. Thus, the State maintains that defendant is unable to articulate any particular prejudice that he suffered or to specify how he was denied a fair trial.

## A.

We begin by addressing whether the police have a duty to record the details of out-of-court identification procedures that result in positive identifications and non-identifications as well as near misses and hits. Following the United States Supreme Court's decision in *Kirby v. Illinois,* 406 *U.S.* 682, 92 *S.Ct.* 1877, 32 *L.Ed.2d* 411 (1972), this Court in *Earle, supra,* determined that

defense counsel "need not be present" at a pre-indictment identification procedure. 60 *N.J.* at 552, 292 *A.*2d 2. Having come to that conclusion, however, the Court added that

enforcement authorities should nonetheless make a complete record of an identification procedure if it is feasible to do so, to the end that the event may be reconstructed in the testimony. The identity of persons participating in a lineup should be recorded, and a picture should be taken if it can be. If the identification is made or attempted on the basis of photographs, a record should be made of the photographs exhibited. We do not say a failure hereafter to follow such procedures will itself invalidate an identification, but such an omission, if not explained, should be weighed in deciding upon the probative value of the identification, out-of-court and in-court.

[*Ibid.*]

In this case, the Appellate Division held that the dictates of *Earle* were followed because the photographic array used by the police was kept intact. The panel stated that *Earle* "does not require that the police do more" and that it was not "willing to require that more be done." We believe that the public interest in ensuring the accurate re-creation of out-of-court identification procedures at trial would be disserved by a crabbed reading of *Earle*.

The Court in *Earle* intended that when "the identification is made or attempted on the basis of photographs," the array should be preserved. 60 *N.J.* at 552, 292 *A.*2d 2. In our view, it would make little sense to preserve the array of an "attempted" identification, if a report also did not reflect the "complete record" of that identification procedure. Without a report provided to him in discovery, a defendant likely would have no way of knowing about the attempted identification. When an "identification is made," the result is no less important if the witness selects a person other than the defendant, for such information could give rise to the defense that someone else committed the crime. *See United States v. Ash,* 413 *U.S.* 300, 318–19, 93 *S.Ct.* 2568, 2578, 37 *L.Ed.*2d 619, 632 (1973) ("Selection of the picture of a person other than the accused, or the inability of a witness to make any selection, will be useful to the defense in precisely the same manner that the selection of a picture of the defendant would be useful to the prosecution."); *State v. James,* 144 *N.J.* 538, 561, 677 *A.*2d 734

(1996) ("The victim's initial choice of someone else's photograph suggests that some other person may have been the perpetrator."). Moreover, the dialogue between a law enforcement officer and a witness may be critical to understanding the level of confidence or uncertainty expressed in the making of an identification and whether any suggestiveness, even unconsciously, seeped into the identification process. The Court in *Earle* ultimately was concerned about safeguarding evidence and enhancing the reliability of the truth-seeking function of the trial. That is why the Court ordered that law enforcement officers "make a complete record of an identification procedure if it is feasible to do so, to the end that the event may be reconstructed in the testimony." *Earle, supra,* 60 *N.J.* at 552, 292 *A.*2d 2.

The importance of recording the details of what occurred at an out-of-court identification flows from our understanding of the frailty of human memory and the inherent danger of misidentification. Four decades ago, Justice Brennan remarked that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade,* 388 *U.S.* 218, 228, 87 *S.Ct.* 1926, 1933, 18 *L.Ed.*2d 1149, 1158 (1967); *see also State v. Herrera,* 187 *N.J.* 493, 501, 902 *A.*2d 177 (2006). Eyewitness identification can be the most powerful evidence presented at trial, but it can be the most dangerous too.[5] Misidentification is widely recognized as the single greatest cause of wrongful convictions in this country.[6] In

---

[5] *See, e.g., United States v. Langford,* 802 *F.*2d 1176, 1182 (9th Cir.1986) ("[J]uries almost unquestioningly accept eyewitness testimony."), *cert. denied,* 483 *U.S.* 1008, 107 *S.Ct.* 3235, 97 *L.Ed.*2d 740 (1987); Elizabeth F. Loftus, *Eyewitness Testimony* 19 (1979) ("All the evidence points rather strikingly to the conclusion that there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!' "); Patrick M. Wall, *Eye–Witness Identification in Criminal Cases* 19 (1965) ("[I]n general, juries are unduly receptive to identification evidence and are not sufficiently aware of its dangers.").

[6] *See, e.g., State v. Dubose,* 285 *Wis.*2d 143, 699 *N.W.*2d 582, 592 (2005) (recognizing that "research strongly supports the conclusion that eyewitness

2001, in issuing guidelines for out-of-court identification procedures, New Jersey's Attorney General referred to "recent cases[ ] in which DNA evidence has been utilized to exonerate individuals convicted almost exclusively on the basis of eyewitness identifications." Letter from Attorney General John J. Farmer, Jr., to All County Prosecutors, et al., at 1 (Apr. 18, 2001). Requiring the recordation of identification procedures, to the extent feasible, is a small burden to impose to make certain that reliable evidence is placed before a jury and that a defendant receive a fair trial.

It bears mentioning that the 2001 guidelines issued by the New Jersey Attorney General's Office were intended "to ensure that identification procedures in this state minimize the chance of misidentification of a suspect." *Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures* 1 (Apr. 18, 2001). Those guidelines provide:

> When conducting an identification procedure, the lineup administrator or investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness. Preparing a complete and accurate record of the outcome of the identification procedure is crucial. This record can be a critical document in the investigation and any subsequent court proceedings. When conducting an identification procedure, the lineup administrator or investigator should:
>
> 1. Record both identification and nonidentification results in writing, including the witness' own words regarding how sure he or she is.
> 2. Ensure that the results are signed and dated by the witness.
> 3. Ensure that no materials indicating previous identification results are visible to the witness.
> 4. Ensure that the witness does not write on or mark any materials that will be used in other identification procedures.
>
> [*Id.* at 7.][7]

---

misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined").

[7] We note that the Attorney General added the caveat that the guidelines "should in no way be used to imply that identifications made without [the] procedures are inadmissible or otherwise in error," stating that "it is clear that current eyewitness identification procedures fully comport with federal and state

In its supplemental brief to the Court in this case, the State has represented that in view of the Attorney General guidelines, "all law enforcement agencies in New Jersey have been directed to record in writing both identification and non-identification results of identification procedures."

We commend the Attorney General's Office for issuing guidelines intended to promote the reliability of out-of-court identifications. However, this Court has the constitutional obligation through its supervisory role over the court system to ensure the integrity of criminal trials. *See N.J. Const.* art. VI, § 2, ¶ 3 (providing that "Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts"); *State v. Daniels,* 182 *N.J.* 80, 95–96, 861 *A.*2d 808 (2004) (recognizing that "our courts have a responsibility to guarantee the proper administration of . . . criminal justice" and "[t]hat responsibility requires this Court at times to exercise its supervisory authority over criminal trial practices" (first alteration in original) (internal quotation marks omitted)). "This Court's policy concerning pretrial discovery has been to encourage the presentation of all relevant material to the jury" and, to that end, in exercising our supervisory authority "[w]e have from time to time moved either by rule or by ad hoc determination to expand discovery in criminal proceedings as we have gained experience or profited from the experience of others." *State ex rel. W.C.,* 85 *N.J.* 218, 221, 222, 224, 426 *A.*2d 50 (1981) (stating that in certain circumstances courts have "inherent judicial authority to order pretrial lineups as part of the discovery practice in criminal proceedings").

Last year, we exercised our supervisory authority over the administration of our criminal court system by promulgating *Rule* 3:17, which requires electronic recordation of "custodial interrogations conducted in a place of detention" in all homicide cases,

---

constitutional requirements." Letter from Attorney General John J. Farmer, Jr., to All County Prosecutors, et al., at 3 (Apr. 18, 2001).

effective January 1, 2006, subject to specific defined exceptions, such as when recordation is not feasible. *See R.* 3:17 (adopted Oct. 14, 2005). That rule will apply to other serious criminal offenses beginning January 1, 2007. *Ibid.* Recognizing the powerful impact of a confession on a jury and the benefit of an objective, reviewable record in evaluating interrogation procedures used to obtain a defendant's out-of-court statement, we adopted *Rule* 3:17 to enhance the reliability of the factfinding process in our courts.[8]

We now exercise our supervisory powers under Article VI, Section 2, Paragraph 3 to require that, as a condition to the admissibility of an out-of-court identification, law enforcement officers make a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results. Preserving the words exchanged between the witness and the officer conducting the identification procedure may be as important as preserving either a picture of a live lineup or a photographic array. When feasible, a verbatim account of any exchange between the law enforcement officer and witness should be reduced to writing. When not feasible, a detailed summary of the identification should be prepared.[9] In the station house where tape recorders may be available, electronic recordation is advisable, although not mandated. Needless to say, the use of a tape recorder will minimize, if not eliminate, dueling testimony recounting what actually occurred at an identification procedure. Tape recording will serve as much to protect the police from claims of

---

[8] *Rule* 3:17 was adopted based on recommendations issued by the Special Committee on the Recordation of Custodial Interrogations, which was commissioned in response to this Court's decision in *State v. Cook,* 179 *N.J.* 533, 847 A.2d 530 (2004). *See Report of the Special Committee on the Recordation of Custodial Interrogations* (Oct. 14, 2005), *available at* http://ttninterweb1.judiciary.state.nj.us/notices/reports/recordation.pdf.

[9] The making of a contemporaneous record is the preferred method. We suggest that law enforcement officers not delay in recording or summarizing the out-of-court identification procedures.

improper conduct as it will to preserve evidence. Defendants will be entitled in discovery to any reports or tape recorded statements covering an identification procedure.[10]

We suspect that in light of the Attorney General's guidelines, law enforcement officers are already following most of the practices now required by this Court. We refer to the Criminal Practice Committee the preparation of a rule for our consideration that incorporates the recording requirements for out-of-court identifications.

## B.

We next consider defendant's claim that the failure of the Newark police to make a detailed record of the out-court-identification procedures denied him exculpatory information and therefore a fair trial. We agree with the State that there is no credible support for that claim. Before the beginning of the second trial, defendant had learned the specifics of every positive, equivocal, and missed out-of-court identification. That information was available through various police reports, the *Wade* hearing testimony, and Al Bucci's testimony at the first trial. With full disclosure before his trial, defendant cannot show that he suffered any prejudice having the capacity to cause an unjust result.

Defendant specifically draws attention to Detective Manuel Garcia's report, which did not fully memorialize the response of eleven-year-old Richie Munoz to the showing of the photographic array shortly after the murder of his cousin. The report merely stated that Munoz "was unable to make a positive identification." At the *Wade* hearing, however, Detective Garcia testified that when shown the first array, Munoz "pointed to a couple of

---

[10] As a result of our decision, we need not address defendant's argument that due process mandates the recording of identification procedures. "We have stated on numerous occasions that 'a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of [the] litigation.' " *State v. McAllister,* 184 *N.J.* 17, 44, 875 *A.2d* 866 (2005) (quoting *Bell v. Twp. of Stafford,* 110 *N.J.* 384, 389, 541 *A.2d* 692 (1988)).

photographs" and indicated that they "looked similar" to the killer, but could not make a positive identification. Although Detective Garcia should have detailed Munoz's complete response in his report, defendant nevertheless had the information in time for his trial and cannot now claim that he was surprised or prejudiced.

Similarly, no report recorded that approximately two days after the murder Bucci failed to make a photographic identification of defendant's minivan or that when police officers drove him to the minivan's location that day, he stated that he was seventy-five percent certain it was the vehicle used in the shooting. In the first trial, when Bucci testified to those details, the court declared a mistrial because of the surprise to defendant. In possession of that information, defendant has no claim of surprise or prejudice in the second trial.

Defendant also suggests that because the police officers failed to contemporaneously record what occurred during the showing of the first array to Munoz and the showing of the minivan to Bucci, information of value may have been lost to defendant. Those issues were fully developed at trial through direct and cross-examination, and we will not speculate that some unarticulated prejudice crept into the case.[11]

This case bears little resemblance to *State v. Peterkin*, 226 *N.J.Super.* 25, 543 *A.*2d 466 (App.Div.), *certif. denied*, 114 *N.J.* 295, 554 *A.*2d 850, *and certif. denied*, 114 *N.J.* 470, 555 *A.*2d 598 (1988), relied on prominently by defendant. In that case, as the result of an extensive undercover operation, the State Police arrested thirty-two individuals for drug-related offenses based

---

[11] We note that defendant considered it "miraculous" that Munoz and DiEduardo could make identifications from the same array that seven and one half months earlier led to no positive identifications. However, Munoz testified that he did not choose anyone when first shown the array because he was "scared and nervous." Likewise, DiEduardo testified at trial that he too was frightened when first presented with the array. He explained that at the time of the viewing he was surrounded by "seven cab drivers" in his office and "[couldn't] really pick out a man because [he would] jeopardize [his] life."

primarily on identifications made by an undercover officer. *Id.* at 30–32, 543 *A.*2d 466. Unlike the present case, in *Peterkin* "one of the principal investigating police officers failed to preserve the photographic arrays from which identifications of defendants were made and attempted to conceal his dereliction by fabricating" new arrays. *Id.* at 30, 35, 543 *A.*2d 466. There, because of the inability to reconstruct the arrays and official misconduct, the Appellate Division affirmed the trial court's suppression of the pretrial photographic identifications. *Id.* at 42–43, 543 *A.*2d 466.

Here, importantly, the photographic arrays were kept intact and the police did not fabricate evidence. The police simply did not prepare detailed reports on the identification procedures. Despite the deficiencies in the police reports, the information that defendant characterizes as "exculpatory" was in his hands well before the second trial. Therefore, we conclude that he was not deprived of meaningful discovery or denied a fair trial.

### III.

■ Last, we consider defendant's contention that the trial court should have conducted a *Wade* hearing "not only [on] the admissibility of the photo identifications of defendant, but also those of his van." Defendant urges that we apply "the same standards of reliability for identifications of automobiles or other objects [that are applied to] identifications of persons." Defendant essentially suggests that we mandate lineups and photographic arrays for cars and other objects. We first note that defendant made no request for a minivan *Wade* hearing at trial and no objection to the admissibility of testimony identifying his minivan. Second, we reject defendant's invitation to extend to inanimate objects, such as cars, the carefully crafted due process protections applicable to identification procedures of persons.

Defendant has not directed us to any authority in this State or any other jurisdiction in support of his position. To the contrary, other jurisdictions have not adopted defendant's proposal. *See, e.g., Inge v. Procunier,* 758 *F.*2d 1010, 1015 (4th Cir.) (holding that "the identification of a truck is not governed by the constitutional

limitations that control the identification of a defendant"), *cert. denied,* 474 *U.S.* 833, 106 *S.Ct.* 104, 88 *L.Ed.*2d 85 (1985); *Hughes v. State,* 735 *So.*2d 238, 261 (Miss.1999) (en banc) (noting that "an examination of relevant authorities from federal and state law demonstrates that a 'line-up' to identify inanimate objects is not subject to the same constitutional restrictions which burden eyewitness identifications of criminal defendants"), *cert. denied,* 528 *U.S.* 1083, 120 *S.Ct.* 807, 145 *L.Ed.*2d 680 (2000); *State v. Cyr,* 122 *N.H.* 1155, 453 *A.*2d 1315, 1317 (1982) (stating that although police only showed witness one car, "no court to our knowledge has held that due process requires a 'lineup' when the identification of an inanimate evidentiary object is at issue").[12]

Courts have noted that the due process concerns implicated in the pretrial identification of a person are not present in the identification of physical evidence. *See Dee v. State,* 273 *Ga.* 739, 545 *S.E.*2d 902, 903 (2001). "The risks inherent in a misidentification of inanimate objects produced in the thousands are not the same as the risks of misidentification of unique human beings." *People v. Miller,* 211 *Mich.App.* 30, 535 *N.W.*2d 518, 523 (1995)

---

[12] *See also Johnson v. Sublett,* 63 *F.*3d 926, 932 (9th Cir.) (holding that there is no requirement for "car line-ups" and rejecting defendant's argument that victim's in-court identification of automobile should have been excluded because it was "tainted by unduly suggestive pretrial identification procedures"), *cert. denied,* 516 *U.S.* 1017, 116 *S.Ct.* 582, 133 *L.Ed.*2d 504 (1995); *People v. Edwards,* 126 *Cal.App.*3d 447, 178 *Cal.Rptr.* 876, 881 (1981) (holding that "the identification of physical evidence by a witness is not suppressible ... upon the ground that the ... procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (second alteration in original) (internal quotation marks omitted)), *cert. denied,* 459 *U.S.* 849, 103 *S.Ct.* 109, 74 *L.Ed.*2d 97 (1982); *Dee v. State,* 273 *Ga.* 739, 545 *S.E.*2d 902, 903 (2001) (recognizing that "the pre-trial procedures used to determine the constitutional admissibility of identification testimony do not apply when the identity of an inanimate object is concerned"); *State v. Bruns,* 304 *N.W.*2d 217, 219 (Iowa 1981) (declining to "extend cases protecting the accused's right to a fair pretrial identification of his person to the pretrial identification of items of physical evidence"); *Commonwealth v. Chmiel,* 585 *Pa.* 547, 889 *A.*2d 501, 523–24 (2005) (agreeing with "other states that have examined the issue that there is no basis for applying the identification procedures applicable to suspects to testimony identifying inanimate objects").

(per curiam), *appeal denied,* 451 *Mich.* 907, 550 *N.W.*2d 530 (1996). Courts that have addressed this issue have held that "[f]actors surrounding automobile identifications, such as the suggestiveness of the proceedings, affect only the weight, and not the admissibility, of the evidence." *State v. Roscoe,* 145 *Ariz.* 212, 700 *P.*2d 1312, 1324 (1984), *cert. denied,* 471 *U.S.* 1094, 105 *S.Ct.* 2169, 85 *L.Ed.*2d 525 (1985); *see also Inge, supra,* 758 *F.*2d at 1015; *Miller, supra,* 535 *N.W.*2d at 523; *State v. King,* 31 *Wash.App.* 56, 639 *P.*2d 809, 812 (1982).[13]

Here, through cross-examination and summation, defendant argued to the jury that the witness identifications of his minivan were unreliable because of the unduly suggestive procedures used by the police. The jury had the opportunity to determine for itself what weight, if any, to give to the identifications based on the suggestive nature of some of the identification procedures. We conclude that the trial court did not commit error, much less plain error, by not excluding testimony concerning the identifications of defendant's minivan.

## IV.

We therefore affirm the judgment of the Appellate Division upholding defendant's convictions. We refer to the Criminal Practice Committee for our consideration the preparation of a rule requiring that law enforcement officials record out-of-court identification procedures consistent with this opinion.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.

---

[13] We do recognize, however, that in a rare and " 'extreme case' the degree of suggestiveness of an identification procedure concerning an inanimate object might be so great as to contravene a defendant's due process rights." *Commonwealth v. Spann,* 383 *Mass.* 142, 418 *N.E.*2d 328, 332 (1981). This is not such a case.