**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0623-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

INOW RAINEY,

     Defendant-Appellant.

_____

> Submitted December 14, 2020 – Decided March 25, 2021
>
> Before Judges Rothstadt and Susswein.
>
> On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 15-03-0547.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).
>
> Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Lisa Sarnoff Gochman, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from his jury trial convictions for armed robbery, aggravated assault, weapons offenses, and drug offenses. The charges arose from a home-invasion robbery. Defendant and two codefendants were arrested minutes after the crime was committed. The vehicle in which they were arrested contained the gun used in the robbery and a ski mask bearing defendant's DNA. Both codefendants testified at trial that defendant was the mastermind. Defendant now claims for the first time on appeal that several errors were committed at trial. After carefully reviewing the record in light of the applicable legal principles, we reject defendant's contentions and affirm.

I.

A Monmouth County Grand Jury charged defendant and codefendants Earl Snyder and Tylee Handley with (count one) first-degree armed robbery, N.J.S.A. 2C:15-1; (count two) second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 and 2C:15-1; (count three) second-degree burglary, N.J.S.A. 2C:18-2; (count four) second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); (count five) third-degree aggravated assault with a deadly weapon, N.J.S.A. 2C:12-1(b)(2); (count six) third-degree terroristic threats,

A-0623-18

N.J.S.A. 2C:12-3(b); (count nine)[1] first-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), (j); (count ten) second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); (count eleven) fourth-degree possession of marijuana, N.J.S.A. 2C:35-5(b)(11); (count twelve) third-degree possession of marijuana with intent to distribute, N.J.S.A. 2C:35-5(b)(11); (count thirteen) third-degree possession of marijuana within 1000 feet of school property with intent to distribute, N.J.S.A. 2C:35-7; (count fourteen) second-degree possession of marijuana within 500 feet of a public park with intent to distribute, N.J.S.A. 2C:35-7.1; (count fifteen) second-degree possession of a firearm in the course of committing a drug offense, N.J.S.A. 2C:39-4.1(a); and (count seventeen) second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).

---

[1] Count seven separately charged codefendant Snyder with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b). Count eight charged only codefendant Handley with first-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). Count sixteen charged codefendant Handley with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).

After defendant's trial, Handley pled guilty to first-degree armed robbery and was sentenced to an eight-year term of imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:47-3.2. Snyder pled guilty to second-degree armed robbery and was sentenced to a five-year term of imprisonment subject to NERA.

A-0623-18

Prior to trial, the trial court granted the State's motion to dismiss count fourteen (possession of marijuana near a public park). The trial took place over the course of eight non-consecutive days. At the conclusion of the State's case-in-chief, the trial court denied defendant's motion for judgment of acquittal on counts two (conspiracy to commit armed robbery), four (aggravated assault), and five (aggravated assault with a deadly weapon), but granted defendant's motion for a judgment of acquittal on counts twelve (possession of marijuana with intent to distribute), thirteen (possession of marijuana within 1000 feet of school property with intent to distribute), and fifteen (possession of a firearm in the course of committing a drug offense).

The jury thereafter found defendant guilty of counts one (armed robbery), three (burglary), the disorderly persons offense of simple assault as a lesser-included offense of count five (aggravated assault with a deadly weapon), six (terroristic threats), nine (unlawful possession of a weapon), ten (possession of a weapon for an unlawful purpose), and eleven (possession of marijuana). The jury acquitted defendant of counts two (conspiracy to commit armed robbery) and four (aggravated assault). In a bifurcated proceeding, the jury found defendant guilty of count seventeen (second-degree certain persons not to have weapons).

4

At the sentencing hearing, the court denied defendant's motion to dismiss the armed robbery guilty verdict as against the weight of the evidence. The court granted the State's motion to sentence defendant to an extended term of imprisonment pursuant to N.J.S.A. 2C:43-6(c). The court sentenced defendant on the first-degree armed robbery conviction to a twenty-five-year term of imprisonment subject to NERA. On count three (second-degree burglary), the court imposed a five-year term of imprisonment subject to NERA, to be served concurrently to count one. The court merged counts five (simple assault) and six (third-degree terroristic threats) into counts one and three. On count nine (first-degree unlawful possession of a handgun), the court sentenced defendant to a ten-year period of imprisonment with a forty-two-month period of parole ineligibility, to be served concurrently to count one. On count ten (second-degree possession of a firearm for an unlawful purpose), the court sentenced defendant to a five-year prison sentence with a two-and-one-half-year period of parole ineligibility, to be served concurrently to count one. On count eleven, (fourth-degree possession of marijuana), the court sentenced defendant to a one-year prison term concurrent to count one. Finally, on count seventeen (second-degree certain persons not to have a weapon), the court imposed a five-year

A-0623-18

prison term concurrent to count one. Defendant was ordered to pay restitution to two of the victims.

Because the strength of the State's case is a relevant consideration in applying the plain error rule, we recount the proofs elicited at trial in considerable detail. The evidence focused on defendant's involvement in a home-invasion robbery committed in November 2014.

All four persons present in the home during the invasion testified at trial. C.S.[2] testified that at 4:00 a.m., he was awoken by his girlfriend, T.K., after she heard yelling coming from a different bedroom in the house they shared with another couple, T.M. and M.M. Before C.S. could investigate the noise, the bedroom door was opened by a man with a gun. The man was wearing gloves and a black cloth ski mask. C.S. described the man as having a "skinny build."

The thin masked man pointed a gun at C.S. and T.K. and ordered them to get on their knees and crawl on the floor to the other bedroom. C.S. and T.K. complied. In the next bedroom, they encountered another masked man standing over M.M. and T.M., who were lying prone on their bed. The man was wearing

---

[2] We use initials throughout this opinion to respect the privacy of the crime victims.

a "silver- [or] chrome-colored mask . . . [with] a smile and eye holes," and gloves. He was described as "kind of a fat . . . or . . . heavyset guy."

C.S. testified the "fat guy" hit T.M. with his fists and demanded money and marijuana. The heavyset assailant stated that he was "going to shoot the bitch" and asked the thinner robber for the gun. The thinner invader handed over the gun, after which the heavyset assailant pistol-whipped T.M. in the back of the head. The heavyset assailant also struck M.M. in the back of the head with the gun. C.S. next was punched, kicked, and struck in the back of the head with the gun, causing him to lose consciousness.

The two masked men took turns ransacking the house looking for money or valuables. They took $1000 found in a bedside drawer and another $200 in M.M.'s wallet. They also took a jar of marijuana, three watches, jewelry, and a Gucci belt.

The entire encounter lasted around twenty minutes. Once the robbers left, C.S. escaped from the house and ran to a neighbor's house for help. There, he called the police. T.M., M.M, and C.S. went to a hospital, where they all required staples to close their head wounds.

Shortly after the robbery, an Asbury Park police officer conducted a traffic stop of a vehicle with an altered license plate that had pulled over to the side of

the road without using a turn signal. Defendant was seated in the front passenger seat, codefendant Snyder was in the driver's seat, and codefendant Handley was in the rear passenger seat. As he approached the vehicle, the officer noticed a metal-colored Halloween mask on the rear floorboard near Handley, black gloves on the back seat, and a black ski mask on defendant's lap. He also smelled the odor of raw marijuana.[3] The officer testified that all three occupants appeared nervous.

The officer ran a warrant check on the driver, Snyder, which revealed an outstanding traffic warrant. Snyder was arrested and consented to the officer's request for permission to search the vehicle. Before the search, all three men exited the vehicle, which was recorded on the police vehicle's mobile video recorder (MVR). The video shows defendant putting on a black vest.

The consent search of the vehicle revealed a handgun, a mason jar and sandwich bag containing marijuana, jewelry, watches, and a Gucci belt. Three

---

[3] We note that N.J.S.A. 2C:35-5(b)(12)(b)(1), enacted on February 22, 2021 as P.L. 2021, c. 19, §1, now provides in relevant part that "[t]he odor of marijuana . . . shall not constitute reasonable articulable suspicion to initiate a search of a person . . . ." Defendant did not move before the trial court to suppress the physical evidence found in the vehicle pursuant to the consent search authorized by the driver. Nor has defendant sought leave to file a supplemental brief on whether the new statutory provision has retroactive effect or any bearing on the search conducted in this case, and we offer no opinion on those questions.

pairs of gloves and the two facemasks (the Halloween mask and the black knit ski mask) were also found in the vehicle. The officer observed what appeared to be blood on the bottom of the handle of the gun. DNA testing showed the blood had come from T.M. During a search at the police station, police recovered $37 from defendant, $56 from Snyder, and $1247 from Handley. The arrest reports indicate defendant was 5' 7" tall and weighed 135 pounds; Handley was 5' 3" tall and weighed 235 pounds; and Snyder was 5' 10" tall and weighed 205 pounds.

T.K. identified: the gloves, masks, and gun used by the robbers; the sweatshirts, pants, and boxer shorts worn by the robbers; and the various items stolen from the home. C.S. identified: the gun, masks, and sweatshirts. M.M. identified: the gun, masks, sweatshirts, pants, and gloves used by the robbers, as well as the mason jar of marijuana and the Gucci belt. T.M. identified: the masks and clothing used by the robbers.

M.M., C.S, and T.K. were shown the video of the traffic stop recorded by the MVR. The audio from the video was muted and the defendants' faces were blacked out. Each victim testified the clothing worn by two of the men (Handley and defendant) looked like the clothing worn by the robbers, other than the vest defendant put on as he exited the vehicle. The victims also testified that one of

9

the men appeared to have a similar build to the thin robber and the other had a similar build to the heavyset robber.

After the arrest, Monmouth County Prosecutor's Office (MCPO) Lieutenant Scott Samis responded to the Asbury Park Police Department to assist with the investigation. At the police station, Lieutenant Samis advised Snyder of his Miranda rights, which Snyder waived. Snyder informed Samis where the crime occurred. When Snyder learned there was blood on the gun used in the robbery, he expressed surprise, because "no one [was] supposed to get hurt." Snyder provided crucial information relating to his role and the roles of the other defendants in the robbery.

Snyder and Handley both testified for the State in exchange for reduced sentences. Snyder testified that he met with defendant and sold him a handgun. During that meeting, defendant discussed his plan to rob the victims' house. The two agreed to commit the robbery together and planned to reconvene later that day.

At around 10:00 p.m., the pair met and drove to the victims' house. However, upon seeing the house, Snyder realized he knew T.M. and became reluctant to carry out the planned robbery. Defendant then contacted Handley, who agreed to participate in the robbery. Defendant and Snyder drove to Asbury

10

Park, picked up Handley at around 2:00 or 3:00 a.m., and explained the plan for the robbery. The trio then drove to defendant's apartment to retrieve the gun, black gloves, and masks. Around 4:00 a.m., Handley and defendant committed the robbery while Snyder remained in the vehicle.

Handley also testified concerning his involvement in the robbery. His testimony was generally consistent with Snyder's testimony and with the accounts given by the four victims. Handley testified that, after the robbery, he and defendant ran to Snyder's car and stashed the gun and robbery proceeds in the glovebox before driving to Asbury Park. Handley identified the Halloween mask he wore and the black cloth ski mask that defendant wore.

MCPO Detective Robert Flanigan testified that a latent fingerprint lifted from the Halloween mask matched a print of Handley's left thumb. Defendant's fingerprints were not found on any items related to the robbery. However, DNA analysis identified defendant as the source of the major DNA profile found on the black knit ski mask recovered from Snyder's vehicle. Defendant also was identified as the source of a major DNA profile found on one set of gloves found in Snyder's car.

II.

Defendant presents the following contentions for our consideration:

11

POINT I

DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE STATE ELICITED TESTIMONY FROM AN INVESTIGATING DETECTIVE THAT THE STATE ENGAGES IN PROFFER SESSIONS TO MAKE DEALS WITH "BAD" PEOPLE—I.E., CO-DEFENDANT HANDLEY—"TO GET THE WORST PEOPLE"— I.E., DEFENDANT. (Not Raised Below).

POINT II

THE FAILURE TO ISSUE A "MERE PRESENCE" CHARGE WITH RESPECT TO DEFENDANT'S PRESENCE IN THE CAR DENIED HIM DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).

POINT III

THE TRIAL COURT'S FAILURE TO PROVIDE THE JURY WITH ANY GUIDANCE ON HOW IT SHOULD ASSESS THE VICTIMS' IDENTIFICATIONS OF DEFENDANT FROM THE MVR DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).

POINT IV

THE THREE ERRORS ASSERTED SUPRA HAD A CUMULATIVE IMPACT ON DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).

We begin our analysis by acknowledging certain legal principles that govern this appeal. As we have noted, defendant did not raise any of his

contentions on appeal to the trial court. His failure to object below constitutes a waiver of the right to challenge the alleged trial errors on appeal. R. 1:7-2. Nevertheless, we may review each contention for plain error. R. 2:10-2. We choose to address all of defendant's contentions on their merits.

Under the plain error standard, we disregard any error or omission unless, in the interests of justice, we conclude "it is of such a nature as to have been clearly capable of producing an unjust result." Ibid. This standard is demanding and aims to "provide[] a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error." State v. Bueso, 225 N.J. 193, 203 (2016).

We first address defendant's contention that Lieutenant Samis made inappropriate and prejudicial remarks when explaining to the jury why the State entered into a proffer agreement with codefendant Handley. Defendant argues Samis's testimony injected improper character evidence and led the jury to convict him because he had a history of criminal conduct and a propensity for criminality. Defendant further claims that Lieutenant Samis's testimony concerning the need to corroborate Handley's testimony as part of the proffer agreement process unfairly bolstered Handley's credibility. We disagree with both arguments relating to the lieutenant's testimony.

The specific testimony defendant now challenges came in the form of Lieutenant Samis's explanation of the purpose and mechanics of a "proffer agreement."  The lieutenant began by explaining,

> A proffer is where an attorney and their client who is the defendant come into the prosecutor's office with the prosecutor who is running the case and we call it—it's like a queen of the day letter.  They have rights.  They're able to sign the form, which technically [] protects their rights.   So, they're able to talk about any crime committed and we're not going to go out and arrest them or investigate.   The only time we could do that, is if they took the stand and they lied about it.   So, specifically it protects them.  And what we want them to do in the session is talk about crimes.  Talk about what took place.  Give us the information that we need to prosecute and put cases together, and again, it gives them eventually consideration for the charges later on.

The following exchange then occurred:

> [Prosecutor]: Shouldn't you be arresting people if they're telling you bad stuff?
>
> [Samis]: This is a great tool for law enforcement, especially investigations.  <u>We need bad to get bad. Sometimes you have to make deals with bad people to get the worst people.</u>  And in these cases, we're able to get some people inside who have done these bad things and they're able to provide us information that we're able to solve cases and certainly make great cases better, because of their cooperation and knowledge that we don't have.
>
> [(emphasis added).]

The lieutenant further testified that consideration in the form of a reduced sentence is given only after law enforcement has corroborated the information provided in the proffer session. Specifically, the following exchange occurred:

> [Prosecutor]: So, . . . the day that somebody gets to come in and give all this information, there are no talks about numbers or consideration or promises or anything like that on that first day; is that correct?
>
> [Samis]: [W]e never talk about promises . . . . it's always consideration. But, again, that's the first step. <u>We also have to corroborate the information. They can come in and say, you know, I know who killed this person, that person, and that's just talk. We have to corroborate, investigate, make sure what they're giving us is correct</u>.
>
>      . . . .
>
> [Prosecutor]: So, in this particular instance, both [Handley] and [Snyder] agreed to cooperate; is that correct?
>
> [Samis]: They did. Yes.
>
> [Prosecutor]: Okay. And in exchange for that, did they receive what you told us about? This consideration?
>
> [Samis]: Yes. They got consideration on their sentences . . . .
>
> [(emphasis added).]

A-0623-18

Lieutenant Samis then testified in a manner that, according to defendant, combined the prejudice of improper character evidence and unfair testimony that bolstered the credibility of Handley and Snyder.  The lieutenant testified:

> [A]gain, you need bad guys to get bad guys.  You need the worst to get the worst.  When you make these offers and we stick by them, later on some of these guys get out and some of them again get into trouble.  So, if we stick by our word and we're doing the right thing by them and you could get a case again, you're hopeful that you can work another case out or you can solve another crime because they know we stick to what's doing right.
>
> Again, you know, you talk about ten years [the sentence Snyder and Handley received under their plea agreements].  Ten years is a long time.  This was a horrific crime.  These guys came forward and took the responsibility.  They testified.  They told the truth, I hope, and that's—they deserve that cooperation and that ten years.

Lieutenant Samis immediately clarified, however, that he had "no idea" as to the substance of the codefendants' testimony.

We agree that certain aspects of the lieutenant's testimony were problematic.  Had there been a timely objection, a curative instruction would have been appropriate.  But as we have noted, there was no objection and thus no opportunity for the trial court to provide a curative instruction.  We believe that in this instance, "failure to 'interpose a timely objection constitutes strong evidence that' [the challenged testimony] was actually of no moment."  State v.

16

Tierney, 356 N.J. Super. 468, 481 (App. Div. 2003) (quoting State v. White, 326 N.J. Super. 304, 315 (App. Div. 1999)). See also State v. Frost, 158 N.J. 76, 84 ("The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made. The failure to object also deprives the court of an opportunity to take curative action." (citing State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997))); State v. Timmendequas, 161 N.J. 515, 576 (1999) ("Failure to make a timely objection indicates defense counsel did not believe the remarks were prejudicial at the time they were made." (quoting State v. Irving, 114 N.J. 427, 444 (1989))).

We believe the lieutenant's explanation of the proffer agreement process actually supported the defense trial strategy, which sought to paint Handley and Snyder as untrustworthy criminals who falsely implicated defendant in exchange for a reduction in their own prison sentences. We add that Lieutenant Samis's testimony regarding "the worst people," while objectionable, was not impermissible "other crimes" evidence as defendant now suggests. The lieutenant did not expressly or impliedly inform the jury that defendant had committed a crime or bad act other than the ones for which he was being tried.[4]

---

[4] The situation would have been quite different if Lieutenant Samis had told the jury about defendant's prior conviction for armed robbery. However, the jury

It bears noting that Handley and Snyder testified prior to Lieutenant Samis, and both codefendants claimed that defendant was the mastermind of the plan to rob the victims. Viewed in that context, the lieutenant's reference to the "worst" apparently refers to the most culpable among the persons who committed this particular crime.

Nor did the lieutenant's testimony impermissibly bolster the credibility of Handley's and Snyder's testimonies by suggesting that the State had corroborated their accounts by means of evidence that was not presented to the jury. The jury heard compelling corroborative evidence linking defendant to the crime. Although greater caution should have used in eliciting the lieutenant's explanation of the proffer agreement process, we believe that jurors understand innately that an agreement to reduce a sentence in exchange for testimony presupposes such testimony will be truthful. It bears emphasizing that the jury was properly instructed that they alone determine the credibility of witnesses.[5]

---

was not informed of defendant's prior conviction until the second stage of the bifurcated trial on the "certain persons" gun charge.

[5] Specifically, the judge instructed the jury:

> You will only consider such facts which in your judgment has been proven by the testimony of the witnesses or from exhibits admitted into evidence by

The lieutenant's testimony did not impermissibly intrude on that critical fact-finding function reserved to the jury.

We also add that even if the admission of Lieutenant Samis's testimony constituted error, it did not rise to the level of plain error warranting a reversal. After carefully reviewing the State's evidence in its entirety, it is clear the lieutenant's references to the "worst people" and the corroboration component of cooperating witness agreements were not capable of producing an unjust result. See State v. Marrero, 148 N.J. 469, 497 (1997) (affirming a conviction

----

> the [c]ourt,", and "[a]s judges of the facts, you are to determine the credibility of the witnesses . . . you weigh the testimony of each witness and then determine the weight to give to it. Through that process, you may accept all of it, a portion of it, or none of it.

At that time, the judge also gave the model jury charge for testimony of a cooperating co-defendant or witness as to co-defendants Handley and Snyder, particularly noting to the jury that

> [t]he law requires that the testimony of [these cooperating witnesses] be given careful scrutiny. In weighing their testimony, therefore, you may consider whether they had a special interest in the outcome of [the] case and whether their testimony was influenced by the hope or expectation of any favorable treatment or reward or by any feelings of revenge or reprisal.
>
> [Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006).]

because of the presence of "near overwhelming evidence of guilt independent of the other-crime evidence").  The testimony from the codefendants and the victims, coupled with the forensic evidence and defendant's presence in the getaway vehicle only minutes after the robbery occurred, constitutes overwhelming evidence of defendant's guilt.

## III.

We turn next to defendant's contention that the trial court failed to sua sponte tailor the "mere presence" jury instruction to the particular circumstances of this case.  Importantly, defendant did not request any changes be made to the model charge that was given to the jury.  In any event, read in context with the full jury charge, the jury well understood that the "mere presence" instruction applied to the vehicle and not just the scene of the armed robbery.

"It is a well-settled principle that appropriate and proper jury charges are essential to a fair trial," and that a jury charge functions as a "road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations."  State v. Savage, 172 N.J. 374, 387 (2002) (quoting State v. Martin, 119 N.J. 2, 15 (1990)).  It also is well-settled that when a defendant does not object to the charge, "there is a presumption that the charge was not error and was unlikely to prejudice . . . defendant's case."  State v. Montalvo, 229 N.J.

20

300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)). Relatedly, in State v. Whitaker, we held that reading a model jury charge, as was done in the present case, "is a persuasive argument in favor of the charge as delivered." 402 N.J. Super. 495, 513–14 (App. Div. 2008).

"When a prosecution is based on the theory that a defendant acted as an accomplice, the trial court is required to provide the jury with understandable instructions regarding accomplice liability." Savage, 172 N.J. at 388. The jury instructions relating to accomplice liability include the admonition that mere presence at the scene of a crime is insufficient to establish guilt. Model Jury Charges (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6) Accomplice" (rev. June 11, 2018). This principle also applies to possessory offenses. State v. Whyte, 265 N.J. Super. 518, 523 (App. Div. 1992).

The trial judge in this case read the following model jury charge:

> Mere presence at or near the scene does not make one [a] participant in the crime, nor does the failure of a spectator to interfere make him a participant in the crime. It is, however, a circumstance to be considered with the other evidence in determining whether he was present as an accomplice. Presence is not in itself conclusive evidence of that fact. Whether [the] presence has any probative value depends upon the total circumstances. To constitute guilt, there must exist a community of purpose and actual participation in the crime committed.

While mere presence at the <u>scene of the perpetration of a crime</u> does not render a person a participant in it, proof that one is <u>present at the scene of the commission of the crime</u>, without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is possible for you as jurors to infer that he assented thereto, lent to it his [countenance] and approval and was thereby aiding the same. It depends upon the totality of the circumstances as those circumstances appear from the evidence.

[(emphasis added).]

Significantly, the judge also instructed the jury that "you must consider the accomplice charge separately as to each charge."

These combined instructions clearly informed the jury that mere presence "at the scene of the perpetration of a crime" was inadequate to establish defendant's guilt for any offense, including the possessory offenses. Moreover, the scene of the commission of the possessory gun and drug offenses was not restricted to the victims' residence but also included Snyder's car.

Furthermore, the judge instructed the jury on the concepts of actual and constructive possession. For example, the trial court issued the following jury instruction with respect to possession of a firearm:

[I]n order for a person to be armed with a firearm, the State must first prove beyond a reasonable doubt that he was in possession of it. The word possess means a knowing, intentional control of a designated thing, accompanied by a knowledge of its character.

22

. . . .

> This possession cannot merely be a passing control that is fleeting or uncertain in its nature. In other words, to possess withing the meaning of the law, the defendant must knowingly procure or receive the item possessed or be aware of his control thereof for a sufficient period of time to have been able to relinquish his control if he chooses to do so.

It is well-settled that the model actual possession and constructive possession charges provided to the jury in this case are sufficient to explain the concept of mere presence and the requirement for additional evidence to establish guilt beyond a reasonable doubt. State v. Randolph, 228 N.J. 566, 592 (2017); State v. Montesano, 298 N.J. Super. 597, 612–15 (App. Div. 1997).

In sum, viewing the jury instructions in their entirety leads us to the conclusion that the trial court was not required to tailor the "mere presence" model charge with respect to both the robbery scene and Snyder's vehicle. In the absence of a specific request-to-charge, we do not believe the trial court committed error—much less plain error—especially in view of the overwhelming evidence of guilt.

IV.

We likewise reject defendant's claim that the trial court erred by failing to instruct the jury concerning the victims' identification testimony when they were

23

shown the MVR recording of defendant alighting from Snyder's car. At the charge conference, defense counsel not only failed to request an identification charge but further explained to the trial court why such an instruction was unnecessary.[6] The victims did not identify defendant and his confederates—the face masks evidently worked to conceal their features. As we have noted, the defendant's faces were blacked out from the MVR recording. The victims only testified that the clothing and physical builds of the individuals in the car were similar to the robbers.

Defendant's reliance on State v. Jones is misplaced. 224 N.J. 70 (2016). In Jones, the Court noted, "due process concerns implicated in the pretrial identification of a person are not present in the identification of physical evidence." Id. at 93 (quoting State v. Delgado, 188 N.J. 48, 67 (2006)). However, the Court recognized that "identifying an article of clothing that has been placed on a suspect during a showup" is fundamentally different from "merely show[ing] [the victim] the [clothing] they found in the vicinity near where defendant was located." Ibid. The Jones Court concluded that police orchestrated an impermissibly suggestive showup identification procedure. In

_____

[6] During the charge conference, defense counsel told the court, "I agree that no one identified my client by [']he's the man that did it, he's sitting at the table,['] except the two codefendants. . . . The victims did not do that."

that case, the victim could not identify the defendant after an initial viewing. The police made Jones put on clothing they suspected had been worn during the offense, at which point the victim "realized it was him." Id. at 78. The present case raises none of the suggestibility concerns extant in Jones.

As noted, even were we to determine that the trial court erred with respect to the jury charge, the omission does not rise to the high bar of plain error. The evidence linking defendant to the crime is overwhelming. As the Court noted in State v. Cotto, although "[f]ailure to issue [an identification] instruction may constitute plain error," that "determination . . . depends on the strength and quality of the State's corroborative evidence." 182 N.J. 316, 326 (2005) (internal citations omitted). During trial in this case, the victims again viewed and positively identified the articles of clothing taken from defendant and Handley after their arrest. This identification of the clothing was independent of the victims' identification of the clothing worn by defendants in the MVR recording. Additionally, the arrest report was introduced into evidence. That report showed that Handley and Snyder were both much heavier than defendant. Therefore, the distinctive builds of defendant and Handley were put before the jury independent of the victims' testimony relating to the MVR recording.

Considering the overwhelming evidence of guilt, none of the errors asserted by defendant on appeal, whether viewed individually or collectively, provide a basis to overturn the verdict. To the extent we have not addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0623-18