**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4432-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOHN T. KERNAN,

    Defendant-Appellant.

_____

Argued December 12, 2016 — Decided August 22, 2017

Before Judges Sabatino and Nugent.

On appeal from the Superior Court of New
Jersey, Law Division, Camden County,
Indictment No. 13-12-3525.

Justin T. Loughry argued the cause for
appellant (Loughry and Lindsay, LLC,
attorneys; Mr. Loughry, on the brief).

Nancy P. Scharff, Assistant Prosecutor, argued
the cause for respondent (Mary Eva Colalillo,
Camden County Prosecutor, attorney; Ms.
Scharff, of counsel and on the brief).

PER CURIAM

    Defendant John Kernan appeals from a judgment of conviction

for third-degree aggravated assault, third-degree endangering an

injured victim, and petty disorderly persons mutual fighting. For those offenses, the court sentenced him to an aggregate four-year probationary term. Contending he is entitled to a new trial, defendant challenges the admissibility of an out-of-court identification and the admissibility of an officer's hearsay testimony about the identification. He also challenges the verdict as against the weight of the evidence. For the reasons that follow, we affirm.

In December 2013, a Camden County grand jury returned an indictment charging defendant and co-defendant Jacob Terry with seven offenses: two counts of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (counts one and five); two counts of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7) (counts two and six); third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2(a) (count three); and two counts of second-degree conspiracy to commit aggravated assault, N.J.S.A. 2C:5-2 and 12-1(b)(1) (counts four and seven). Terry negotiated a plea.

Defendant's trial spanned four days in March 2015. The jury found him guilty of third-degree aggravated assault of Christopher Howells (count two), and third-degree endangering an injured victim Christopher Howells (count three). The jury also found defendant guilty of the lesser-included petty disorderly offense of mutual fighting — with Devon Scioli — on count six, which

originally charged him with third-degree aggravated assault.  The jury acquitted defendant of the remaining charges.

Defendant moved for a new trial, arguing that an independent witness's out-of-court identification of him was inadmissible at trial and the verdict was against the weight of the evidence.  In April 2015, the court denied defendant's motion for a new trial and sentenced defendant to a four-year probationary term on count two, third-degree aggravated assault; a concurrent four-year probationary term on count three, third-degree endangering an injured victim;  and a concurrent one-year probationary term on count six.  The court also imposed appropriate penalties and assessments.  This appeal followed.

The charges against defendant stem from a melee that occurred on July 21, 2013, after a concert at the Susquehanna Bank Center in Camden.  The brawl began outside the center, in parking lot 11, not far from a bus.  It started over a woman and involved two groups: the victims and their friends (the first group); and codefendants Kernan and Terry, Kernan's brother, and their friends (the second group).

Those involved in the melee were young men ranging in age from late teens to mid-twenties, and they had, for the most part, arrived at the Susquehanna Bank Center well before the concert to

"tailgate." Most drank beer while tailgating, and some consumed more beer during the concert.

No one disputes the fight's prelude was a confrontation between co-defendant Terry and his ex-girlfriend, who was the current girlfriend of a young man associated with the first group. Nor does anyone dispute that the two victims, Devon Scioli and Christopher Howells, were injured and eventually transported to Cooper Hospital for medical care. The State and defendant sharply dispute who threw the first punch and what happened after the first punch was thrown.

The State developed the following proofs. The first group, consisting of victims Devon Scioli and Christopher Howells, and eight of their friends, all from Cape May County, came to the concert on a fifteen-seat passenger bus. While one of the first group's members, Ryan Price, was walking back to the jitney after the concert with one victim, Christopher Howells, Price saw his cousin's current girlfriend, co-defendant Terry's former girlfriend, punching Terry in the face. Price recognized "a lot of people" in the second group as they were also from Cape May County.

According to Price, Terry had "a couple of his good friends with him in the [second] group." His friends included defendant and defendant's brother. After being struck in the face by his

4

ex-girlfriend, Terry became incensed and started screaming that he was going to find and "beat the crap out of [Price's cousin]." Terry and his friends were "basically plotting to attack [Price's] cousin and jump him once he came close to the bus."

Price approached and told Terry, "you're not going to jump my cousin, nobody is going to get in a fight, why don't you guys just go wherever you came from and leave." As the two exchanged words, defendant punched Price in the head, knocking him to the ground. After Price fell to the ground, Terry, defendant, and defendant's brother jumped on top of him and beat him. To protect himself, Price "curled up in a ball in a fetal position and put [his] hands over [his] head." Most of the blows he took were to the back of his head, his back, and the back of his ribs.

By the time defendant, co-defendant Terry, and defendant's brother were beating Price, a crowd had gathered and other members of the first group, including Devon Scioli, had arrived. When Scioli attempted to assist Price by throwing off the assailants, they turned to attack him. Once Price "got [his] orientation back," he saw defendant, defendant's brother, and Terry punching and kicking Scioli as Scioli was on the ground "curled up in a ball protecting his face." When Price tried to assist Scioli, the three assailants turned on him once again, knocking him to the ground and beating him.

Price testified that defendant, defendant's brother and Terry "were very actively involved." Although "[t]here may have been one more on their side that stepped in for a slight period of time, . . . the three that . . . [Price] saw nonstop punching and kicking people were the two Kernans and Terry." Price said, "anybody that stepped into that arena, they took down."

Price estimated he was punched thirty times and kicked "more than that." When questioned about the attack on Christopher Howells, Price said:

> I saw him after. I cannot say I saw the act of it happening. I saw that act, the same exact thing that happened to him happened to me as it happened to Devon [Scioli]. You know, where you were knocked down and beat on, but in [Howell's] case his injuries were so much worse because the first punch knocked him out cold.

Price described Howells as "shaking, laying on the ground with blood all over his face, his teeth were missing. . . . [H]e had a gash . . . down his entire face and there was blood everywhere."

According to Scioli, while Price and Terry were engaged in the verbal exchange about Terry threatening to jump Price's cousin, defendant "punched [Price] in the back of the head when he [was not] looking and took him to the ground." Scioli attempted to pull defendant off [Price], because [Price] "had a couple kids now

6

kicking him." When Scioli pulled defendant off Price, defendant grabbed Scioli from behind, picked him up, and slammed him down. Scioli tried to get up, but defendant was on top of him, punching him. Scioli looked toward Price and saw Price curled up in a ball with four or five people kicking him. Scioli freed himself and tried to aid Price, but he was knocked to the ground and people started kicking and punching him. Scioli was struck in the "head, chest, back, face, [and] everywhere."

The melee lasted approximately five to ten minutes. The attack stopped when people noticed that Chris Howells was on the ground, unconscious, face down in his own blood. People in the crowd started to scream and other people dispersed. Scioli did not see what happened to Howells, who was "standing off to the side." Scioli did say, however, that Howells was struck twenty or thirty seconds after defendant had tackled Scioli. Scioli also said defendant had "gotten up and ran away from me."

Scioli testified he had been struck nearly thirty times. He was dazed, and his heart was "pounding through [his] chest." He was transported by ambulance to Cooper Hospital, where he was treated for approximately six hours and released. According to Scioli, he experiences daily neck pain as the result of the injuries inflicted upon him.

7

The attending emergency physician at Cooper Hospital testified Scioli was alert but "seemed a little distressed" when he was brought into the hospital. Scioli complained of headaches and dizziness. The doctor's diagnosis was "alleged assault, facial laceration and alcohol use." According to the doctor, a CT scan of Scioli's cervical spine revealed a "disc protrusion at C5-C6." The doctor explained that a disc protrusion at C5-C6 was tantamount to "a little bit of swelling of that disc[,] . . . not quite a herniated disc, but definitely some swelling at that level."

Howells testified he drank nine or ten beers before entering the concert but none thereafter. When the concert ended, he returned to the bus parking lot. Before entering the bus, he noticed Price and Scioli had "stepped away from the [bus] to take care of a matter that [he was not] completely aware of." They were approximately thirty to forty feet away from the bus. Five or six people surrounded them. Howells turned away and when he turned back he saw Price "down." Howells left the bus and started walking toward Price to help him. Before he could reach Price, he was "met by a taller gentleman over six [feet] in a dark sleeveless shirt." This person approached Howells "to [his] face." That is the last thing Howells remembered.

Howells was attended to by emergency personnel when the police and an ambulance arrived at the parking lot. He was transported

to Cooper Medical Center where he awoke to severe, throbbing, burning pain extending down his head through his neck.

The attending physician at Cooper testified Howells was admitted with a large laceration to his forehead, contusions to his forehead, and contusions to his left knee and feet. He was complaining of severe neck pain and he was missing two caps from his front teeth. A CT scan revealed a sinus fracture. The doctor irrigated and stitched the laceration, cleaned the abrasions, prescribed pain medication, and recommended Howells follow up with a specialist "as needed." During the two months following his discharge, Howells underwent physical therapy to help rehabilitate his neck injury.

Scioli's girlfriend and another young man in the first group also testified for the State. Scioli's girlfriend was walking back to the bus when she saw Price in a heated conversation "with a group of guys." A guy with a bandana hit Price in the back of the head. When that happened, Scioli got involved. Her perception was the fight involved a large group of guys against Price and Scioli. She was eventually able to get to Price and she tried to push them away from the brawl. While she was doing that, "the same kid . . . with the bandana came over [her] right shoulder [from behind] and tried to punch [Price] in the head again." She

did not see Howells until the fight ended.  "He was unconscious and bleeding profusely out of his head from what [she] could see."

The other young man from the first group testified the fight erupted after defendant punched Price while Price was in a heated exchange with Terry.  The young man corroborated that Price and Scioli were repeatedly attacked by two or three people.  When the fighting stopped, the young man and others "flagged down" a sheriff and called an ambulance.  The young man also "saw . . . out of the corner of his eye," Howells "go down."  He then observed people starting to rush over to Howells "because he was laying on the ground in a pool of blood."  On cross-examination, the young man acknowledged telling police he saw Howells get hit and the punch that sent Howells into the bus.  He also saw the "kid" who threw the punch was wearing a dark colored tank top jersey with red trim.

An independent witness who lived in Pennsylvania saw what happened to Howells.  She made the identification that resulted in defendant's arrest.  The witness had attended the concert with her husband and friends.  They returned to their bus and were waiting for other passengers to arrive when she saw "a group [in] front of [her] bus start arguing and then the fight started."  She described the assault on the "victim":

> It started out as a bunch of yelling and then
> I saw the victim get hit and then somebody
> else hit him also.  And then they continued
> to hit him and that's when I started following
> the crowd because I thought he was in trouble.
>
>          . . . .
>
> He just was backing up getting hit and hit.
> And then I noticed there was another school
> bus where he kept . . . backing up.  And all[]
> I kept thinking was somebody has to stop this
> now.   And  then  exactly  what  I  thought
> happened.  They hit him, he hit his head on
> the back of the bus and then he was down on
> the ground.

The independent witness saw two males kick the victim after he was down.  She was "probably . . .  no more than three or four feet away from them."  The two attackers were wearing jeans and white T-shirts "and one of them had . . . an American flag bandana around his neck."

When one of the males kicked the victim again, the witness started screaming for someone "to get them off of him."  She thought the victim was dead and did not see where the two males went when the police arrived.

The police arrived a few minutes after the assailants walked away from the victim.  When the police arrived, the independent witness told them repeatedly the victim needed help.  The police officers put her in a car drove her "to other places because [she thought] they had a few people lined up."  She explained that the

11

police took her to a location in the parking lot where another police officer was waiting for her.

The independent witness was transferred into the waiting police car. The police had four people lined up against a fence, approximately twenty feet from the car. The car's headlights were on. The independent witness identified the victim's attackers as the "[t]he two that were in the jeans and the T-shirt and the one still had the bandana around his neck." Approximately thirty minutes had elapsed between the attack and her identification of defendant and co-defendant Terry.

Questioned at trial about how certain she was of the identification, the independent witness responded: "I was almost a hundred percent sure. I even said to the police officer, . . . I definitely know what they were wearing. Like I said, I did not see their faces but from their clothing and just by the bandana itself." The witness did not identify defendant in court.

The independent witness testified on a Wednesday and the trial resumed the following Tuesday. On the intervening Monday, defense counsel wrote to the court and demanded a hearing concerning the independent witness's out-of-court identification. When trial resumed on Tuesday, defendant characterized the procedure regarding his identification as "kind of a show-up, but not really." Counsel continued: "It was kind of a lineup too, of

12

some sort, but when I went back and looked at the show-up identification procedure form I saw that some of the verbiage on it trailed off and really [did not] give us any information."

Counsel explained that although he "might not have felt" initially that a hearing was necessary because the identification took place within half of an hour of the assault, "now that I have this data it's incumbent upon me to ask for this to be reviewed." Counsel felt it necessary to explore the issue outside the presence of the jury and "to probe exactly how this identification happened." He thought this was a "serious issue" since it was "in the nature of a show-up . . . or a very, very small lineup. Counsel believed "[t]here [was] a serious issue as to whether there was some suggestiveness" and argued that showups "are almost inherently suggestive."

The trial court denied defense counsel's request for a hearing. The court recalled that "in the pretrial application there was some indication there may be an application for a Henderson[1] hearing," but no such application was made before the trial commenced. The court noted, "Henderson says that the defendant, of course, may make a tactical choice not to explore an estimator variable pretrial in order to save up cross-

---

[1] State v. Henderson, 208 N.J. 208 (2011).

examination for trial." The court also noted defendant's recently received written application did not provide any exhibits, leaving the court unable to "glean from those what they said or [did not] say."

When pressed, defense counsel could not pinpoint any discovery that would have caused him to be surprised by the independent witness's trial testimony. Defense counsel did cite a discrepancy between the independent witness's recollection of the perpetrators wearing white T-shirts and defendant and co-defendant being shirtless when the police detained them. The court, in response, pointed out "the bandana, apparently, based upon testimony, seemed to be the crucial element in her identification." The court also agreed with defense counsel that charging the jury on "out-of-court identification" would be "very appropriate."

The State presented the testimony of two officers. Camden County Sheriff's Investigator Jacob Sidwa responded to the incident shortly after 11:30 p.m. After arriving at the scene, the investigator was directed to Howells, who was lying on the ground, breathing, but motionless. Howells' face was badly beaten and he looked like he was missing teeth.

According to Investigator Sidwa, while examining Howells, the independent witness approached him, said she knew who "did it,"

and that "they're over here." Approximately fifty yards away, four males were walking along a fence line away from the parking area. The investigator had the four males detained — defendant, his brother, Terry, and a fourth person. Officers transported the independent witness to the area. Investigator Sidwa stood with the four males, who were approximately fifteen yards from the vehicle in which the independent witness was sitting. Investigator Sidwa said defendant was wearing blue jeans but no shirt. Defendant "had an American flag-like handkerchief or bandana tied around his neck." The investigator believed defendant had a black t-shirt rolled up in his hand. Investigator Sidwa testified "there was identification made" and defendant was thereafter detained.

The second officer, Camden County Sheriff Captain John Fetzer, gave testimony consistent with that of Investigator Sidwa. Captain Fetzer testified the independent witness flagged him down and said she saw the whole thing. According to the Captain, the independent witness said the perpetrators were "walking along that fence line." He proceeded to where they were walking and assisted in detaining them. Three of the four males were defendant, his brother, and Terry. Although the Captain was not with the independent witness, he testified:

> She pointed them out. She pointed the two
> suspects out, which were [defendant] - - she
> identified him as the male without a shirt

with an American flag bandana, blue jeans and the tan boots. I pointed to him and [the officer in the car with the independent witness] radioed over 'affirmative that's one of the suspects.' I placed him in the vehicle.

And then she proceeded to describe [co-defendant] Terry, who also was shirtless, with blue jeans and black sneakers, and he was holding a dark-colored shirt. She identified him as well. He was placed in the arrest van.

According to Captain Fetzer, the independent witness said the other two suspects were not involved in the incident, and they were immediately released.

The State did not present testimony from the officer who was in the police car when the independent witness identified defendant.

Defendant testified and presented the testimony of his brother and a friend. He also presented the testimony of an officer who videotaped a statement from Price — to show an inconsistency in Price's testimony as to the location on his head where he was initially punched — and a nurse, who telephoned the victims the night after the incident. The nurse testified that Scioli said he had no neck pain, and Howells "denied feeling any facial or nasal pain."

Defendant's friend testified that after leaving the concert, he met up with defendant, who was wearing a dark, cut-off flannel shirt earlier in the night. When they reached the parking lot,

16

they saw Terry arguing with Price's cousin and another individual. Price's cousin was soon joined by others. The verbal altercation escalated into "pushing and shoving and then punches were thrown." Defendant's friend said Terry, Price's cousin, and Price were doing the pushing and shoving, and that defendant arrived after the argument between Price and Terry had started. Defendant's friend did not see Price knocked to the ground during the initial pushing and shoving.

The fight erupted into a "melee" involving "[thirty] to [forty]" people. Terry, defendant's brother, and defendant were "outnumbered" because there was "a big group of those fellow individuals" who "were jumping on [defendant] and [Terry] pretty good," and "[defendant] was defending himself after he was pretty much assaulted."

Defendant's friend also said he "kept [his] visuals on [defendant] and [defendant's brother] very, very well[,]" and "saw [defendant] get slammed to the ground by a couple of kids and there was, like, four of them on top of him." Defendant's friend "push[ed] all four kids off of him[,]" and then he helped defendant up and "wiped his back off because he had rocks on it[.]" Defendant's friend did not see defendant kick anybody, nor did he see defendant and Terry attack anyone together, as "[t]hey were

17

outnumbered substantially." Defendant was not in the area where Howells was knocked to the ground.

Defendant and his friend "tried to vacate the premises as soon as possible." They walked away from the fight toward defendant's truck "to get a couple things" before "catch[ing] the train home."[2] They never reached the truck. Police officers stopped them and "ordered [him] to put [his] hands behind [his] back and they put handcuffs on [them] and they told [him] to lay on the ground face down."

Defendant's brother gave similar testimony. He saw the exchange between Terry and his ex-girlfriend. According to defendant's brother, however, the girl's current boyfriend (Price's cousin) came out of a bus and threatened Terry, and a fight broke out. Others joined Price's cousin. Defendant's brother insisted "[a] fight was already breaking out before [defendant]'s involvement with the — five or six guys and [Price's cousin] were going after [Terry]. And [defendant] saw that and wanted to help his friend out in any way he could."

After seeing defendant on the ground with four or five people on top of him, defendant's brother tried to pull them off. Defendant's brother also broke a bottle "to divert people's

---

[2] The truck had broken down on the way to the concert so they were looking for another way to return home.

attention and to quell the fighting in any way possible."  During the melee, defendant never hit or kicked anyone; "he was pretty defenseless . . . ."

The melee ended abruptly when people started screaming about a person who was on the ground and appeared to be injured. Defendant's brother and others started walking away from the incident when police stopped them.  Defendant's brother did not flag down a police officer after the incident because "[e]verything kind of happened very quickly and it was very chaotic."  He did not tell the police about the assault on defendant and Terry after they removed his handcuffs and told him to leave because "[he] did not have the opportunity to."

Defendant gave testimony similar to that of his brother and his friend.  He was wearing a black, white and grey plaid cut-off flannel t-shirt, and an American flag bandana.  According to defendant, during the argument between Price and Terry, "[t]here was a point where [he] believed [that Terry] was going to be hit from behind and then that's when [he] yelled and started running towards the group."  Defendant testified, "when [he] yelled it alerted that group of people and they grabbed [him] on [his] way into the situation" and "immediately" started hitting him. Defendant testified that "the whole time [during the fight] [he] was being hit by numerous people and [he] just knew [he] was going

to go to the ground.  So [he] actually threw [himself] on the ground instead of just going down."

Defendant further testified that once he got up and found his brother and his friend, they backed away from the area but "it almost seemed to be like a wall of people coming after [them]."

Defendant said police stopped him and the others in the same parking lot where the fight had occurred.  He did not have a shirt on; it had been torn off during the fight.  His truck was only a block away.  Terry was wearing a "navy blue and black" flannel shirt.  Defendant admitted he was wearing an "American flag bandana" around his neck, but he denied wearing a white t-shirt at any time.

The jury rejected the defense and convicted defendant. Following defendant's sentence, he filed this appeal.

Defendant makes the following arguments:

I.   THE [OUT-OF-]COURT IDENTIFICATION WAS OBTAINED UNDER CIRCUMSTANCES THAT DO NOT PRECLUDE UNFAIRNESS AND UNRELIABILITY, AND THE CONDITIONS FOR ITS ADMISSIBILITY WERE NOT MET.

   A.   The Law Enforcement Officers Conducting the Out-Of-Court Identification Procedure Failed to Make the Necessary Record of What Transpired, and Thus the Out-Of-Court Identification Fails to Satisfy the Condition of Admissibility of State v. Delgado, 188 N.J. 48 (2006).

II.  THE OUT-OF-COURT IDENTIFICATION EVIDENCE INVOLVED HEARSAY TESTIMONY THAT VIOLATED THE PROSCRIPTION

20

AGAINST HEARSAY AND DENIED THE DEFENDANT HIS
CONFRON[T]ATION RIGHTS.

III. THE OUT-OF-COURT IDENTIFICATION WAS SUBSTANTIVELY
UNRELIABLE AND ITS ADMISSION VIOLATES DUE PROCESS;
THE COURT ERRED IN DENYING THE DEFENSE A RULE 104
HEARING, AND THEN ERRED IN PERMITTING THE TESTIMONY
AND EVIDENCE OF THAT IDENTIFICATION, AND ULTIMATELY
ERRED IN DENYING THE DEFENSE'S MOTION TO STRIKE THE
TESTIMONY.

IV. VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE, AND
THE COURT SHOULD VACATE THE THIRD DEGREE VERDICTS.

Defendant first argues the State did not meet the conditions for admission at trial of the independent witness's out-of-curt identification. Specifically, defendant contends the law enforcement officers present when the independent witness made the identification did not comply with the requirements of State v. Delgado, 188 N.J. 48 (2006). Those requirements mandate that officers "make a written record detailing the out-of-court identification procedure," including "the dialogue between the witness and the interlocutor," because "[p]reserving the words exchanged between the witness and the officer conducting the identification procedure may be as important as preserving either a picture of a live lineup or a photographic array." Id. at 63.

The difficulty with defendant's argument is that he did not raise the issue until after the witness testified. By then, the trial court had had the opportunity to assess the credibility of the witness and evaluate her identification in the context of a

considerable amount of trial testimony. Given those circumstances, and because the witness's identification of defendant was made primarily based on the unique bandana he was wearing, we conclude the trial court's denial of defendant's belated motion to strike the witness's testimony did not constitute reversible error.

Rule 3:11 embodies the Supreme Court's pronouncements in Delgado. The rule states:

> (a) Recordation. An out-of-court identification resulting from a photo array, live lineup, or showup identification procedure conducted by a law enforcement officer shall not be admissible unless a record of the identification procedure is made.
>
> (b) Method and nature of recording. A law enforcement officer shall contemporaneously record the identification procedure in writing, or, if feasible, electronically. If a contemporaneous record cannot be made, the officer shall prepare a record of the identification procedure as soon as practicable and without undue delay. Whenever a written record is prepared, it shall include, if feasible, a verbatim account of any exchange between the law enforcement officer involved in the identification procedure and the witness. When a written verbatim account cannot be made, a detailed summary of the identification should be prepared.
>
> (c) Contents. The record of an out-of-court identification procedure is to include details of what occurred at the out-of-court identification, including the following:

(1) the place where the procedure was conducted;

(2) the dialogue between the witness and the officer who administered the procedure;

(3) the results of the identification procedure, including any identifications that the witness made or attempted to make;

(4) if a live lineup, a picture of the lineup;

(5) if a photo lineup, the photographic array, mug books or digital photographs used;

(6) the identity of persons who witnessed the live lineup, photo lineup, or showup;

(7) a witness' statement of confidence, in the witness' own words, once an identification has been made; and

(8) the identity of any individuals with whom the witness has spoken about the identification, at any time before, during, or after the official identification procedure, and a detailed summary of what was said. This includes the identification of both law enforcement officials and private actors who are not associated with law enforcement.

(d) Remedy. If the record that is prepared is lacking in important details as to what occurred at the out-of-court identification procedure, and if it was feasible to obtain and preserve those details, the court may, in its sound discretion and consistent with appropriate case law, declare the

23

identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification.

[R. 3:11.]

If a defendant does not raise a Delgado issue to the "trial court, it is defendant's burden to demonstrate that the police failed to create an adequate record . . . and that such failure was clearly capable of producing an unjust result."  State v. Wright, 444 N.J. Super. 347, 362-63 (App. Div. 2016) (citing R. 2:10-2; Delgado, supra, 188 N.J. at 64; State v. Macon, 57 N.J. 325, 337 (1971)).

Here, defendant did not challenge the independent witness's out-of-court identification until after she had testified at trial, and when he did challenge the identification, he did not clearly articulate a challenge based on the Supreme Court's pronouncement in Delgado.  By then, there was adequate testimony to support the court's decision to admit the independent witness's testimony.

We begin by noting defendant had received in discovery the "Showup Identification Procedures Worksheet" completed by Sergeant Ryan Carpenter.  In the worksheet section inquiring whether a witness has discussed the identification procedure with anyone before or during the procedure, and if so, a summary of what was

24                                                    A-4432-14T1

said, the Sergeant wrote: "[The witness] advised Captain John Fetzer that she witnessed the assault and can identify the[.]" Nothing followed; the sentence was not completed. Thus, before trial, defendant was aware of the form's alleged deficiency in the form.

In addition, the witness had given two statements, which defendant received in discovery. The first was handwritten not long after the incident. In that statement, the witness said she identified the two males in police custody. The second, recorded two days later, included the following questions and answers:

> Q. Okay[,] and then at some point did an officer come take you in a vehicle somewhere? Can you tell me what happened with that?
>
> A. Yes an officer came uh we went over to the (inaudible) lot next to the fence um and [there] was four that climbed up and two of them I identified as um the people that hit [the victim].
>
> Q. Okay and the other two did you recognize them or they weren't involved at all?
>
> A. No I didn't see — the one guy I saw there with the other guy — um I didn't see at all.
>
> Q. Okay so they didn't have nothing to do with it?
>
> A. Uh-Uh.
>
> Q. But the two you picked out were the two people —
>
> A. Uh-huh.

25

Q. that you saw punching and kicking the victim?

A. Yes.

Thus, from the showup worksheet and the statements the witness gave to authorities, defendant was aware the worksheet was incomplete and that shortly after the assault, police had driven the witness to a location where they held four people. The witness then identified two of them as the perpetrators. In other words, defendant was aware before trial of the precise grounds upon which he based the various motions he made after the independent witness testified at trial.

One consequence of defendant's belated challenge to the independent witness's identification was that the trial court had the opportunity to evaluate the circumstances of the witness's identification of defendant as well as the credibility of her testimony. The court found her to be credible and her identification reliable. Moreover, the trial court agreed to give — and gave — an appropriate jury charge to be used in evaluating the reliability of the identification.

Rule 3:11 vests trial courts with "sound discretion" in determining what remedy to impose for a violation of the rule's substantive requirements. Here, after evaluating the independent witness's testimony, the trial court exercised its sound

discretion to admit the testimony and provide an appropriate instruction to the jury, a remedy expressly authorized by Rule 3:11. We find no basis for concluding the trial court misapplied its sound discretion.

In addition to his argument concerning the deficiency in the showup identification procedures worksheet, defendant argues the trial court erred by denying his application for "a hearing under State v. Henderson, 208 N.J. 208, 219 (2011) and State v. Chen, 208 N.J. 307, 326-27 [(2011)]." Defendant says he made the application "to challenge the imminent out-of-court identification (that would be consummated by the police officers' testimony concerning the show-up) as in violation of established standards, as the product of suggestive procedures, and as essentially unreliable." Defendant also asserts he was surprised when the independent witness said she had seen the assailants' faces but had identified them by their clothing. Lastly, he argues that because "unnamed others" had assisted the police in pinpointing four males involved in the melee, third parties may have unduly influenced the independent witness's identification.

Having failed to request a <u>Wade</u>[3] hearing before trial, defendant explains he relied upon certain police reports, but those reports are not part of the appellate record. Because we cannot evaluate the other reports, we decline to consider this argument. <u>See</u> <u>Wright</u>, <u>supra</u>, 344 <u>N.J. Super.</u> at 362. We nonetheless address defendant's belated request for a <u>Wade</u> hearing.

"[T]o obtain a pretrial hearing, a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." <u>Henderson</u>, <u>supra</u>, 208 <u>N.J.</u> at 288 (citation omitted). If a defendant carries this initial burden, "the State must then offer proof to show that the proffered eyewitness identification is reliable — accounting for system and estimator variables — subject to the following: the court can end the hearing at any time if it finds from the testimony that defendant's threshold allegation of suggestiveness is groundless." <u>Id.</u> at 289. Ultimately, a defendant must carry the burden of proving "a very substantial likelihood of irreparable misidentification." <u>Ibid.</u> (citations omitted). If a trial court determines "from the totality of the circumstances that defendant

---

[3] <u>United States v. Wade</u>, 388 <u>U.S.</u> 218, 87 <u>S. Ct.</u> 1926, 18 <u>L. Ed.</u> 2d 1149 (1967).

has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence. If the evidence is admitted, the court should provide appropriate, tailored jury instructions[.]" Ibid.

In Henderson, the Court identified several system variables concerning showups:

> 7. Showups. Did the police perform a showup more than two hours after an event? Did the police warn the witness that the suspect may not be the perpetrator and that the witness should not feel compelled to make an identification?
>
> 8. Private Actors. Did law enforcement elicit from the eyewitness whether he or she had spoken with anyone about the identification and, if so, what was discussed?
>
> [Id. at 290.]

In the case before us, defendant did not make the required threshold showing of some evidence of suggestiveness that could lead to a mistaken identification. In his letter to the court following the independent witness's testimony, defendant did not even mention the term "system variables." The two system variables identified by the Supreme Court were non-existent. Not even one hour had elapsed between the event and the independent witness's identification of defendant; the witness identified defendant before he left the concert parking area. According to the showup worksheet, the police instructed the witness the actual

A-4432-14T1

perpetrators may or may not be in the showup and that the witness should not feel compelled to make an identification. Defendant had the opportunity to cross-examine the independent witness on these issues before he wrote his letter requesting a Wade hearing.

In his letter, defendant noted discovery did not disclose the witness had not seen defendant's face but had identified him by his clothing. He next noted the deficiency in the showup worksheet. Defendant argued these facts raised questions "of how this identification came to be made, and what aspects of it lent suggestion to the selection." This argument implies defendant wanted to embark on a fishing expedition; the argument does not establish the existence of either estimator variables or some evidence of suggestiveness that could lead to a mistaken identification.

Finally, we consider the context of the independent witness's testimony. She said she did not see the perpetrators' faces. Rather, she described them by the way they looked and were dressed. Defendant's American flag bandana was particularly significant. He did not dispute he wore it, and there was no evidence anyone else in the first and second groups, or anyone else present during the melee, wore a similar bandana.

The bandana might have been a suggestive system variable in a lineup in which six men were wearing nothing around their neck

and one was wearing an American flag bandana. In the immediate aftermath of a criminal episode, however, in which only person was identified as wearing such a bandana, and before people had time to flee far from the crime scene, the bandana became a unique identifier that added credence to the witness's identification. Unlike blue jeans or other common clothing, witnesses identified no one else as wearing an American flag bandana; and the witnesses from first group provided more than ample testimony that defendant — the only person identified as wearing an American flag bandana — was one of the most aggressive perpetrators of the attacks on the first group's members.

The Supreme Court explained in <u>Henderson</u>:

> we anticipate that eyewitness identification evidence will likely not be ruled inadmissible at pretrial hearings solely on account of estimator variables. For example, it is difficult to imagine that a trial judge would preclude a witness from testifying because the lighting was "too dark," the witness was "too distracted" by the presence of a weapon, or he or she was under "too much" stress while making an observation. How dark is too dark as a matter of law? How much is too much? What guideposts would a trial judge use in making those judgment calls? In all likelihood, the witness would be allowed to testify before a jury and face cross-examination designed to probe the weaknesses of her identification. Jurors would also have the benefit of enhanced instructions to evaluate that testimony—even when there is no evidence of suggestiveness in the case.

31

[<u>Id.</u> at 294.]

That is what happened here. A credible, independent witness provided an identification under circumstances suggesting the identification was reliable. The witness was subject to cross-examine on estimator variables. The trial court provided the jurors with enhanced instructions to guide them in evaluating the testimony. The trial court committed no error in denying defendant's belated request for a hearing, and even if it did, the error was harmless. <u>R.</u> 2:10-2.

We have considered defendant's remaining arguments and found them to be without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2). We add only these comments. Captain Fetzer's hearsay testimony concerning the independent witness's identification of defendant was harmless error. <u>R.</u> 2:10-2. He simply confirmed the witness identified defendant. The jury understood from the independent witness's testimony that she did not see defendant's face but was identifying him based primarily on his bandana. This evidence, as well as considerable circumstantial evidence, was more than ample to support the jury's verdict.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4432-14T1