**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2345-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MICHELE L. DIKEN, SHAMAN
CHAMBERS, MICHELLE DIKEN,
SHERMAINE MICHAEL, DIKEN
MICHELE, DIKEN MICHELLE,
MITCHEL DICKENSON, and
BIKEN MITCHELL,

    Defendant-Appellant.

_____

Argued October 10, 2018 – Decided February 26, 2019

Before Judges Suter and Firko.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 14-05-0364 and 14-05-0367.

Robert C. Pierce argued the cause for appellant.

Michele C. Buckley, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Michael A. Monahan, Acting Union

County Prosecutor, attorney; Michele C. Buckley, of counsel and on the brief).

PER CURIAM

Defendant Michele L. Diken appeals his January 13, 2016 conviction and sentence, claiming the court erred by denying his Wade[1] motion to suppress an out-of-court identification, and by making erroneous evidentiary rulings. He asserts he was deprived of a fair trial and his sentence was excessive. We reject these arguments and affirm.

I.

Defendant was indicted for first-degree robbery, N.J.S.A. 2C:15-1; second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree theft by unlawful taking, N.J.S.A. 2C:20-3; and fourth-degree illegal possession of a large capacity magazine, N.J.S.A. 2C:39-3(j). He was charged under a separate indictment with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b). Defendant's motion to suppress an out-of-court identification made by the victim of the underlying robbery was denied. Defendant was convicted on all counts of both indictments.

---

[1] United States v. Wade, 388 U.S. 218 (1967).

He was sentenced to twenty-five years imprisonment on the first-degree robbery charge, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.  He was also sentenced to a ten-year term for unlawful possession of a weapon and eighteen months on the large capacity magazine charge, both to be served concurrently with the robbery charge.  The other counts were merged.  On the certain persons charge, he was sentenced to a consecutive term of eight years with four years subject to parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c).  His aggregate sentence was thirty-three years of imprisonment subject to twenty-one years of parole ineligibility.

## A.

We relate relevant facts from defendant's Wade hearing.  On January 26, 2014, just after midnight, L.V. (Linda)[2] arrived at the strip club where she worked, parking her car on the street.  There were street lights in the vicinity. After she placed one of her purses in the trunk and was holding other things, a man approached her and said "give me that."  He was dressed in a black hoodie that was not pulled up, black pants, was of "African descent," wore long dreadlocks that were pulled back and a "skully."  Because he was dressed in

---

[2]  We use initials and a fictitious name to protect the victim's identity.

black, she thought he was a bouncer. She handed him her dance bag and make-up case saying "thank you. You're a life saver." When he asked for her car keys, she realized something was wrong, which was confirmed as he said "you're being robbed, what you think." She screamed, gave him her purse and car keys, and then saw he had a small black gun in his hand pointed at her waist. He got into a red car parked across the street, made a U-turn and drove up the street. She ran up to another person who was coming over to her, and he called 911. The police arrived right away. They used a cell phone to locate hers, which was only a short distance away.

In a few minutes, other officers asked Linda to go with them in a police vehicle. "I was told that they had found two . . . suspects . . . and I was going to be shown the suspects and . . . I would be asked to [identify] who robbed me." Officer Joseph Wassel testified he did not read Linda the on-scene identification instructions but told her from memory that "we're bringing her to see individuals who may or may not be involved in the crime she reported." He testified that he explained "if she did not recognize anybody, for her to tell [them] as much. And that she did not have to identify anybody if she didn't feel that she saw anybody involved in the incident." Linda testified she did not feel pressured to identify

A-2345-15T4

anyone. She did not remember the officer's exact words to her, but "they didn't imply that it was them who robbed me."

In just minutes, they arrived. Linda was in the back of the squad car. The individuals were shown to her one at a time from a location in front of the police car. Each had their hands behind their backs; Linda testified she did not see handcuffs. Each was about her skin color, wore black hoodies and long dreadlocks. One person had on grey pants, not black. She did not recognize the first person shown to her, but she identified the second person, defendant, as the person who robbed her. She was "200 percent" sure of that.

Linda was taken to police headquarters where Officer Wassel completed an on-scene identification packet. Linda's statement indicated that prior to or during the on-scene investigation, she only spoke with police officers. His report said the victim was told not to discuss the identification with other potential witnesses and she did not discuss the identification with anyone else prior to the identification.

The court denied defendant's motion to suppress Linda's out-of-court identification. The judge found that defendant met his initial burden under State v. Henderson, 208 N.J. 208, 288-289 (2011) of showing some evidence of suggestiveness about the manner the identification was conducted. There was

some indication the individuals were handcuffed during the view and in police custody. They were in the presence of at least one officer, were standing in front of a police car, and illuminated by lights from police vehicles at the time each was presented.

The court found, however, that the State presented evidence the identification was reliable. Based on testimony of witnesses at the suppression hearing and the documentary evidence submitted, the court found Linda's identification "to be sufficiently reliable to be presented to a jury." Certain facts "buffered" the suggestiveness of the "show-up" identification. The individuals appeared having similar complexions, long dreadlocks and black hoodies. The identification was not impulsive; she did not identify the first individual. Although the court had "no confidence that all of the instructions required by the <u>Henderson</u> decision were given to [Linda]," he nonetheless accepted as truthful her testimony that "the police did not imply or insinuate that any suspect was the perpetrator of the robbery." She was "very credible" and did not waiver in her testimony despite "vigorous and exacting cross-examination."

The court found no evidence the police discussed the case with Linda before the identification. The identification was made thirty minutes after the robbery. Linda's first encounter with defendant was stress-free because she

thought he was a bouncer at the club. The area was well lit; she was within arm's length of him and his face was not covered. There was no evidence she was impaired in any way. She did not see the gun at first. She quickly identified defendant but not the other individual. The court found that all those circumstances "greatly outweigh[ed] the factors that militate against reliability." The court denied defendant's suppression motion because there was not a "very substantial likelihood of irreparable misidentification."

At trial, the State presented testimony from Linda about the robbery similar to her testimony at the Wade hearing. The court allowed testimony about her out-of-court identification.

Officer Hubert Gonzalez testified that he and his partner were dispatched to the club's location and met with Linda who was "crying, [and was] highly emotional." She gave them a brief description of the lone male robber and of a motor vehicle—a late model Buick or Oldsmobile—red in color, and the direction it had gone, east-bound on Bayway Avenue. She also gave them a description of the items that he took. Using the GPS locator on her phone, the police were able to locate her phone a very short distance from the club at a "dead end" street. The officers went there, which took a "couple of seconds," leaving Linda at the club. Officer Gonzalez testified he saw two people walking

from the dead-end street toward Bayway Avenue, both of whom fit the general description given by Linda. They were detained. A red Buick was parked nearby, which was registered to defendant. No gun was located in the area.

Officer Gonzalez noticed in the fresh snow "two sets of footprints walking away from the car but not returning back to [it]." One set was from the passenger side and another from the driver's side, but both were going toward Bayway Avenue. Tracking the footprints, they ended where defendant and the other individual, S.C. (Steven),[3] were detained. Officer Wassel testified about being dispatched to the club along with his partner, picking up Linda and taking her to the area where her cell phone was found. He testified in detail about the on-scene identification that occurred.

A night watchman working for a business at the address where Linda's phone was found testified that on the night of the robbery, he saw a red car parked parallel to his and shortly after that saw police lights. No one was in the red car, but he saw footprints near it in the snow. The next night, January 27, 2014, while making rounds at 11:00 p.m., he found a gun near the south gate and called the police.

---

[3] This is a fictitious name.

Officer Edwardo Andino testified that about 11:00 p.m. on January 27, 2014, he and his partner were dispatched to a location for a report of "found property" and when they arrived "there was a handgun recovered from a snow mound." It was a loaded semi-automatic. Subsequent tests showed the gun was operable.

The gun was tested for fingerprints but not for the presence of DNA. There were partial fingerprints that were not conclusive.[4] The State's witness, Monica Ghannam, an expert in the field of DNA analysis, testified about conditions that affect DNA analysis. She was not asked to test the gun for DNA but opined the recovery of DNA from it was "severely in question" because it had been in the snow.

The jury returned a verdict against defendant. On appeal, defendant raises the following issues:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING MR. MICHELE'S MOTION TO SUPPRESS THE SHOW-UP IDENTIFICATION BECAUSE THERE WAS AN INADEQUATE RECORD OF THE IDENTIFICATION PROCEDURE IN VIOLATION OF R. 3:11.

---

[4] Defendant called two witnesses for the defense. We have not related their testimony because it is not germane to the issues raised by defendant on appeal.

POINT II

THE TRIAL COURT ERRED BY ALLOWING THE SHOW-UP IDENTIFICATION TO BE USED AT TRIAL BECAUSE THE PROCEDURE DID NOT SATISFY THE CONSTITUTIONAL STANDARDS OF RELIABILITY.

POINT III

THE TRIAL COURT DEPRIVED MR. MICHELE OF HIS RIGHT TO CONFRONT HIS ACCUSER BY EXCLUDING QUESTIONING THAT THE VICTIM WAS A STRIPPER AND ENGAGED IN PROSTITUTION AT THE TIME OF THE ROBBERY.

POINT IV

THE TRIAL COURT ERRED BY ALLOWING THE STATE TO INTRODUCE IRRELEVANT AND SPECULATIVE EXPERT TESTIMONY CONCERNING THE LIKELIHOOD OF SUCCESS TO RECOVER DNA FROM THE HANDGUN, IF THE HANDGUN WAS SUBMITTED FOR DNA TESTING.

POINT V

MR. MICHELE WAS DEPRIVED OF A FAIR TRIAL BECAUSE THE JURY OBSERVED HIM BEING BROUGHT OUT FROM THE BACK OF [THE] COURTROOM SURROUNDED BY SHERIFF'S OFFICERS.  (Not Raised Below).

POINT VI

THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

There is no merit in these issues.

## II.

## A.

"An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425-26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). We do so "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Gamble, 218 N.J. 412, 424-25 (2014) (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We owe no deference, however, to conclusions of law made by trial courts in suppression decisions, which we review de novo. State v. Watts, 223 N.J. 503, 516 (2015).

Defendant argues the trial court erred by denying his motion to suppress Linda's out-of-court identification of him and by allowing testimony about that identification at trial. We are satisfied there was no abuse of discretion.

This case involves a "show-up" identification, which is a single-person lineup that occurs at or near the scene of the crime shortly after its commission.

State v. Henderson, 208 N.J. at 259. An out-of-court identification can be admissible at trial where it is reliable. Henderson revised "the framework for evaluating eyewitness identification evidence." Id. at 287. As revised, a defendant "has the initial burden of showing some evidence of suggestiveness that could lead to mistaken identification." Id. at 288. The trial court found defendant met this initial burden.

Next, "the State must then offer proof to show that the proffered eyewitness identification is reliable—accounting for system and estimator variables . . . ."[5] Id. at 289. The Court provided a "non-exhaustive list" of variables to be considered. The trial court considered these, finding that they supported the reliability of the victim's eyewitness identification. The victim believed defendant was a bouncer there to help her with her things. She could see him clearly, there was lighting on the street, she was not under stress and had not yet seen the gun. She was not under the influence of drugs or alcohol. The identification was made within thirty minutes of the robbery. This case did not involve any "cross-racial identification" issue. Id. at 292. She did not

---

[5] System variables are "within the State's control." Id. at 248. Estimator variables "are factors beyond the control of the criminal justice system." Id. at 261.

A-2345-15T4

identify the first individual shown to her; she definitively identified defendant as the person who robbed her.

The trial court correctly determined "the ultimate burden remain[ed] on the defendant to prove a very substantial likelihood of irreparable misidentification." Id. at 289. Where after reviewing the "totality of the circumstances," and if a defendant has not met his burden of demonstrating "a very substantial likelihood of irreparable misidentification," then the out-of-court statement can be admitted with "appropriate tailored jury instructions." Ibid. We are satisfied the trial court considered the totality of circumstances and agree defendant fell short of the required burden.

Even before Henderson was decided, the Court "exercise[d] its supervisory powers" under the New Jersey Constitution to require the police to make a record of out-of-court identification procedures. See R. 3:11; see also State v. Delgado, 188 N.J. 48 (2006). Rule 3:11(a) provides that "[a]n out-of-court identification resulting from a . . . showup identification procedure conducted by a law enforcement officer shall not be admissible unless a record of the identification procedure is made." That Rule details the method and nature of the recording and the contents. R. 3:11(b) and (c). If "lacking in important details" and if it were "feasible to obtain and preserve those details,"

the court exercising its "sound discretion" consistently with the case law can rule that the identification is inadmissible, redact it and fashion an appropriate jury charge.  R. 3:11(d).

Defendant argues the identification was procedurally flawed.  He did not raise this issue at the Wade hearing.  We review this issue under a plain error standard.  See R. 2:10-2.

The on-scene identification report and statement prepared for Linda's identification of defendant contained the date, time of incident, time and location of on-scene identification, the result of the identification, the statement made when she identified defendant, her confidence in her identification and that she only spoke to officers prior to and during the identification.  Her statement detailed she identified defendant because "[she] saw his face as he robbed [her]" and that she was certain that defendant was the person who "robbed her."  Her statement also indicated that neither Officer Wassel or anyone else tried "to influence or suggest to [her] in any way that [she] should identify this person . . . t[old her] that other witnesses in this case identified or failed to identify this person . . . [or told her] that the person that [she] identified [was] the person who committed the crime under investigation."  The investigation report recounted the actions of the officers who responded and what they did in

the investigation.  Each of these documents, although not prepared on the scene, were prepared contemporaneously, and together, contain all of the information required by Rule 3:11(b).  The identification was procedurally sound.

Defendant argues that Officer Wassel's testimony indicated that "other officers" discussed the reasons they were bringing Linda to the location where defendant was located.  However, Officer Wassel's testimony was that Linda was taken to the location to view individuals who may or may not be involved.  The court found Linda's testimony credible that the officers had not influenced her and that she understood the individuals might not be involved.

Defendant argues Linda was permitted to view her things found in the red car before the identification was made, but that claim was not supported by the record.  In the end, the trial court found Linda's testimony was credible, which negated defendant's arguments.  We have no reason to disturb the court's finding that the out-of-court identification was reliable or, as raised on appeal, that it did not conform with Rule 3:11.  The trial court did not err in denying defendant's motion to suppress or in permitting use of the identification at trial.

## B.

Defendant contends he was deprived of his Sixth Amendment right of confrontation because the trial court would not permit his counsel to ask

witnesses about their knowledge of prostitution at the club or what type of activity happens at a strip club. The defense claimed the victim was engaged in prostitution with Steven on the night in question and was robbed by him while defendant was waiting in the car. On appeal, defendant raises two issues: the victim would not have arrived at work at 12:30 a.m. when the club closed at 2:00 a.m. and Steven had a number of one dollar bills in his possession when he was arrested, which was consistent with Linda's testimony she had about $200.

"The right to confront and cross-examine accusing witnesses is 'among the minimum essentials of a fair trial.'" State v. Budis, 125 N.J. 519, 531 (1991) (quoting Chambers v. Mississippi, 410 U.S. 284, 294-95 (1973)). However, that right "is not absolute, and may, in appropriate circumstances, bow to competing interests." Ibid. (citing Chambers, 410 U.S. at 295). As such, trial courts may limit cross-examination "based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. at 532 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)).

We agree the trial court did not abuse its discretion in excluding this questioning. There was no evidence of prostitution by the victim and to raise the issue of what may occur at a strip club simply would be to attempt to impugn

her character without basis. The victim explained she did not have a schedule and that the dollar bills were earned from dancing. That Steven had a number of dollar bills when he was arrested did not evidence that Linda was engaged in prostitution. The questioning simply was not relevant and properly was not allowed.

C.

Defendant argues he was deprived of a fair trial when the trial court allowed the State to introduce testimony from its expert witness that it was unlikely DNA could have been recovered from a handgun found in the snow. Defendant argues this testimony should not have been allowed because the gun was never submitted for DNA testing.

Detective James Szpond testified at trial that he submitted the gun for fingerprinting but not for DNA testing because "a DNA profile is harder to recover when it's exposed to elements, water, length of time, and all of these issues came into play in [his] decision." The State's expert testified that certain conditions, such as ultraviolent rays, moisture and heat, affected the ability to obtain DNA from an item for testing. She testified it was her opinion that "the recovery of DNA from [the gun was] severely in question because of even half of it being in snow."

A-2345-15T4

"[I]n reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008) (citing Brenman v. Demello, 191 N.J. 18, 31 (2007)). The general rule as to the admission or exclusion of evidence is that "[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence . . . ." State v. Feaster, 156 N.J. 1, 82 (1998). Under this standard, an appellate court should not substitute its own judgment for that of the trial court, unless "the trial court's ruling 'was so wide of the mark that a manifest denial of justice resulted.'" State v. Marrero, 148 N.J. 469, 484 (1997) (quoting State v. Kelly, 97 N.J. 178, 216 (1984)).

We agree with the trial court that the expert's testimony about how DNA was collected and what environmental circumstances could affect its collection and analysis were relevant to determine whether the detective's decision was reasonable not to submit the gun for DNA testing. The expert's testimony was based on her knowledge, training and experience, not speculation. We discern no abuse of discretion by the trial court.

D.

Defendant contends he was deprived of a fair trial because the jury saw him being escorted into the courtroom by sheriff's officers. He raised this issue

for the first time at his sentencing.  Defendant acknowledged there is no factual support in the record for this nor supporting affidavit or certification.  We consider it to be without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

E.

Defendant argues that his sentence was "manifestly excessive."  That claim is not supported.

Our review of a sentencing determination is limited.  See State v. Roth, 95 N.J. 334, 364-65 (1984).  We review a judge's sentencing decision under an abuse of discretion standard.  State v. Fuentes, 217 N.J. 57, 70 (2014).  We must determine whether: "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'"  Ibid. (alterations in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

The trial court granted the State's motion to sentence defendant to a discretionary extended term pursuant to N.J.S.A. 2C:44-3(a) based on his history of convictions from age eighteen, all of which were committed within the next

19                                                      A-2345-15T4

ten years. These included third-degree conspiracy to possess a controlled dangerous substance (CDS), third-degree aggravated assault, third-degree resisting arrest, possession of CDS, third-degree unlawful possession of a handgun, possession of CDS in a school zone, and possession of CDS. In accord with Fuentes, 217 N.J. at 72, 74, the trial court set forth a "careful statement of reasons" for its sentencing decision in which it identified each applicable aggravating and mitigating factor and provided its reasoning as to why each factor did or did not apply. The court addressed defense counsel's argument regarding mitigation, finding it to be "very weak." Then, the court stated it was "convinced that the [a]ggravating [f]actors [three, six and nine] substantially outweigh[ed] the mitigating factor[s]."

The court similarly set out a "careful statement of reasons" for its sentencing decision on the separate certain person indictment. The court found aggravating factors three and six for the same reasons it had for the other charges, and found aggravating factor nine because of defendant's prior conviction for possessing a handgun. The court was "clearly convinced those aggravating factors substantially outweigh the very, very slight mitigating factor that [defense counsel] argued for." The court determined the extended term

applied to the first-degree robbery conviction but sentenced defendant to the "lower end of the extended term scale."

The State's earlier offer of a concurrent sentence on the certain person's charge and its recommendation at sentencing for a ten-year concurrent term did not require the court to sentence defendant in accord with that offer.  Trial courts are not bound by any recommended sentence by the State.  See State v. Nance, 228 N.J. 378, 397 (2017).

The court did not abuse its discretion in imposing an eight-year consecutive sentence.  The court considered the factors in State v. Yarbough, 100 N.J. 627, 643-44 (1985), noting that if defendant's "sentence under the certain persons [ran] concurrent to the other matters, it would render meaningless the certain persons offense."  The consecutive sentence was warranted to "deter those who have a criminal history from possessing guns." The court sentenced defendant on the robbery charge at "the lower end of the extended term scale," and reduced the certain person's sentence to eight years from the recommended ten when it made that sentence consecutive.

The trial court did not abuse its discretion in sentencing defendant nor was the sentence manifestly excessive.  The trial court made sufficient findings, there was ample evidence in the record to support them, the court followed the

sentencing guidelines regarding the extended term and consecutive sentencing and the sentence did not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2345-15T4